EDWARD HAWLEY AND MAYTHEL HAWLEY, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Hawley v. Commissioner
Docket Nos. 12316-83; 12433-83; 13481-83; 13485-83; 13487-83; 13780-83; 15619-83; 16052-83; 16068-83; 17051-83; 17054-83; 19106-83; 19109-83; 19824-83; 23118-83; 24420-83; 24422-83; 32769-83.
United States Tax Court
T.C. Memo 1988-77; 1988 Tax Ct. Memo LEXIS 131; 55 T.C.M. (CCH) 217; T.C.M. (RIA) 88077; February 24, 1988. John Patrick Kelly, for the petitioners. John O. Kent, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: These consolidated cases were assigned to Special Trial Judge Daniel J. Dinan pursuant to section 7456(d) (redesignated as section 7443A(b) by the Tax Reform Act of 1986, Pub. L. 99-514, section *133 1556, 100 Stat. 2755), and Rules 180, 181 and 183. [2] The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE DINAN, Special Trial Judge: These cases were consolidated for trial, briefing and opinion. The 18 dockets which were tried are test cases for petitioners in 296 similar partnerships. Some of those other petitioners have stipulated to be bound by the opinion in these consolidated cases. Respondent determined deficiencies in petitioners' Federal income taxes as follows: Docket No.
Petitioner
Year
Deficiency
12316-83
Edward Hawley and
1976
$ 4,365.42
Maythel Hawley
12433-83
Cesar O. Santos and
1976
4,997.78
Mary Ann Santos
13481-83
Richard J. Montano and
1976
5,342.02
Elaine G. Montano
13485-83
Stanley R. Biart and
1976
5,117.19
Gail E. Biart
13487-83
Robert N. Keefer and
1976
3,573.00
Edna C. Keefer
13780-83
Peter R. Obligato and 1976
8,141.75
Janice A. Obligato
1977
11,950.00
1987
31,002.00
15619-83
Donald C. Knox and
1976
9,966.50
Margaret M. Knox
16052-83
Roger A. Mann and
1976
11,872.30
Joan W. Mann
16068-83
Faustino M. Gayo and
1976
15,011.42
Consuelo C. Gayo
17051-83
John P. Sanders and
1976
7,646.86
Maureen W. Sanders
17054-83
Logan J. Scroggy
1976
5,898.59
19106-83
Cecil E. Leidle and
1973
1,132.60
Patricia L. Leidle
1974
220.76
1975
1,848.56
1976
1,488.00
19109-83
Marvin L. Ohs and
1976
21,429.01
Dixsia L. Ohs
19824-83
Alan A. Fisher and
1976
13,824.70
Leona M. Fisher
23118-83
Walter L. Stilson and
1976
10,593.56
Grace Stilson
24420-83
David G. Torre and
1976
8,327.15
Jessica Torre
24442-83
George D. Hendrix and
1976
5,046.84
Lorraine R. Hendrix
32769-83
William J. Duxbury and
1976
8,328.32
Joanne C. Duxbury
*134 All of the deficiencies for 1976 result from petitioners' interests in coal mining limited partnerships. The issues for decision are (1) whether the Cal-Am coal partnerships' advanced royalty payments in 1976 had any economic substance, (2) whether the Cal-Am coal partnerships had a profit motive for entering into coal leases, (3) whether, in the alternative, the leases were entered into after the announcement of section 1,61203(b), Income Tax Regs., and (4) whether the statute of limitations bars the assessment of income taxes in each case. [3]
Respondent also amended his pleadings to raise an issue under section 631. On brief, respondent withdrew this issue from the Court's consideration. FINDINGS OF FACT
*135 Some of the facts have been stipulated. The stipulations of fact and attached exhibits are incorporated herein by this reference. When they filed their petitions in these cases, all of the petitioners resided in the State of California. Petitioners were deemed to be representative of all the investors in the Cal-Am coal partnerships. The 18 petitioners whose cases were tried were also chosen because a combination of their partnerships held leases in all of the mines leased by the Cal-Am coal partnerships. There are few, if any, significant differences between the partnerships except for their names and the property leased. We will, therefore, sometimes refer to all the partnerships in which petitioners were limited partners as the Cal-Am partnerships. During 1976 petitioners each were involved in one of 14 of a total 296 limited partnerships sold by the Cal-Am Corporation. The Cal-Am partnerships purported to acquire coal mining leases for which the partnerships deducted advanced royalties in excess of income. Petitioners claimed their distributive shares of partnership losses on their 1976 Federal income tax returns. The claimed losses were disallowed by respondent. *136 The Entities
The following entities were associated with the Cal-Am partnerships: Legal Mortgage Corporation (LMC) GPF Coal Investments (GPF) GPL Specializing Investments (GPL) Sun River Ranch (Sun River) LCB Ranch (LCB) Allstate Securities Inc. (Allstate) Dixie Natural Resources (DNR) Dynarad Corporation (Dynarad) Black Rock Resources, Inc. (Black Rock) International Coal Leasing, Inc. (International Coal) Kings Point Corporation (Kings Point)
All of these entities, except Allstate, were controlled by Joseph Laird (Laird) and Kenneth Fisher (Fisher). James Forbes (Forbes) was a director and officer of some of the entities and Allstate which acted as the broker for the sale of Cal-Am partnerships. In 1976, Cal-Am corporation distributed to selected individuals Private Offering Memorandums for approximately 400 coal leasing limited partnerships. The primary objective of the promotion was to encourage those selected individuals to invest in a limited partnerships that would produce tax deductions from the payment or accrual of advanced coal royalties. The Memorandums were dated September 20, 1976, and contained the following introductory statement: *137 The Partnership has been formed for the purpose of acquiring and operating coal mining leases. The coal mining leases include the right to mine coal to exhaustion from the leased premises. * * * In order to develop the coal properties, the Partnership intends to enter into a mining contract. The contract will require the contract miner to begin mining as soon as practicable. In the event an independent mining contractor's services are unavailable, Dixie will assume above contractual obligations on the terms set forth above. Under the terms of the lease which was entered in October 1976, the Partnership will pay in 1976 an advanced mineral royalty of $ 1.00 per ton on 287,500 tons for total consideration of $ 287,500. The source of the total cash paid in 1976, consists of $ 67,200 contributed from the limited partners and $ 220,300 which has been loaned to the partnership from LCB Ranch, Inc. [4] on a non-recourse basis.
The memorandum further represented that the tax write off would be 342 percent of the cash contributions. The prospectus noted that a suitable investor should be in not less than the 50 percent tax bracket. An in-depth tax analysis was also provided. *138 Petitioners received an Offeree Questionaire and a copy of the partnership agreement. The Private Offering Memorandum, together with the Partnership Agreement, described the coal mining lease acquired by the partnership. The applicant would then sign the document and write a check to Cal-Am corporation which was acting as a corporate general partner for most of the limited partnerships. [5]
Articles of Limited Partnership for each of the partnerships involved in these cases were filed with the Recorder's Office in Los Angeles County, California. At the time of filing, the general partners were Cal-Am, DNR, LMC, Laird and Fisher. Forbes was the sole limited partner in each of the 296 partnerships eventually formed. Forbes contributed between $ 400 and $ 600 to the capital of each partnership. The Articles of Limited Partnership were subsequently amended and did not refer to LMC. Furthermore, each individual partnership only had either Laird or Fisher remaining as a non-corporate general partner. Leases
*139 In 1976, the partnerships entered into lease agreements with Black Rock and International Coal. The leases started on October 27, 1976, and ran for a period of seven years. The leases required that advanced royalty payments be made on December 31, 1976. No further payments were required until production of coal was begun. The leases encompassed land located in Wyoming and Colorado. Each partnership leased land which reputedly contained sufficient coal reserves so that any claimed deductions for advanced royalty payments would not exceed 80 percent of the total reserves. An individual partnership was assigned leases which covered 10 acres and were, more often than not, located in different parts of Wyoming and Colorado. In other words, a partnership's leases were not necessarily contiguous and were assigned in a patchwork fashion. Laird determined which leases to assign to a partnership by hypothesizing the coal reserves at each of the locations and then lumping together leases sufficient to meet the 80 percent reserve requirement. Laird did not have a report which estimated the coal reserves for the Wyoming leases. He relied on the oral statements of Ralf W. Greenwood, *140 an electronics engineer, and Ronald Collings, a geologist. Laird relied on the Runge Report for the estimates of the coal in the Colorado leases. The Runge Report had been previously prepared by a geologist having no connection with Cal-Am. The leases provided that the lessees shall pay a royalty equal to the greater of 15 percent of the net pit price plus 20 cents per ton of coal or $ 1.00 per ton. The leases required a $ 287,500 advanced royalty payment which would be recouped from the first 287,500 tons of coal mined. The lessor warranted that the leased premises contained recoverable coal in excess of 133 percent of the amount of coal required to recoup the advanced royalty payments. The leases were originally purchased from various individuals by DNR. The purchase price for each mine varied but representative leases were acquired for $ 22 per acre for Colorado property and $ 50 per acre for Wyoming property. DNR consulted with PC Developments, an unrelated corporation, about which leases to purchase. DNR agreed to transfer the leases to PC Development in consideration for the consulting services PC Development provided to DNR in acquiring Wyoming coal leases and an agreement *141 that PC Development would in turn sublease the mines to Black Rock and International Coal. PC Development did not pay any cash amount to DNR or any other individual to acquire any of the leases. Although the leases required royalty payments to PC Development, Laird testified that Black Rock and International Coal were not obligated to pay royalties until coal was actually mined and produced. The reason for interposing PC Development between DRN and Black Rock and International Coal was that Laird believed that it was important for tax purposes to have an unrelated third party involved in the leases. In at least one instance, on October 27, 1976, PC Development subleased to Black Rock mining lease #027198 which PC Development did no acquire until December 15, 1976. In another instance, a 22,700 acre lease in Weld County, Colorado, was acquired by DNR on December 14, 1976, but had already been subleased by Black Rock and subleased again by the Cal-Am partnerships on October 27, 1976. These early leases were entered into in anticipation of the release of the new treasury regulations under section 612 which prohibited the deduction of advanced royalty payments until the year the mineral *142 production is sold. On October 27, 1977, PC Development assigned its leases to Martco, a Nevada Corporation, incorporated by Laird and Fisher, and retained an overriding royalty interest sufficient to pay the royalties due to the original lessors. Martco subsequently changed its name to Attorney's Title Company. In 1978, all of the leases held by the Cal-Am Partnerships were transferred to Attorney's Title Company acting as trustee. Laird and Fisher executed the trust agreements for each of the partnerships. Virtually all of the leases still held by DNR were also transferred to the trust and were executed by Laird. Subsequently, all the leases were held in trust by Attorney's Title Company which was controlled by John E. Crooks, Laird's close personal friend and attorney. Financing
The original contributions of capital to the limited partnerships of $ 400 to $ 600 were made by Forbes when the partnerships were formed. The partnerships then paid that amount to Black Rock and International Coal for the purchase of the leases and as a down payment on the advanced royalty payments. The partnerships also were obligated to make payments based upon a formula which included *143 cash and non-recourse notes, equal to 3-1/4 times the cash investment. Each partnership required a $ 67,200 cash investment from the limited partners. The nonrecourse note was for $ 220,300. If a partner could not make the original cash investment, then LMC was willing to provide financing to that partner on a recourse basis. Black Rock banked the proceeds from the sale of the leases and wrote a check to Fisher in an amount equal to 80 percent of the cash and notes Black Rock had received. Fisher deposited that amount in the account of GPL, of which Laird was the general partner. GPL loaned the money on a recourse basis to either Dynarad or LCB. International Coal issued checks to Laird equal to 80 percent of the amount International Coal received from the limited partnerships. Laird deposited those funds in GPF, controlled by Fisher, which in turn loaned the money on a recourse basis to Dynarad and Sun River. Laird believed that the cross over from him to a partnership controlled by Fisher, and vice versa, would guarantee that the loans could not be attacked as loans between related parties. On December 31, 1976, when the advanced royalty payments became due, Dynarad, Sun *144 River and LCB loaned, on a non-recourse basis, the limited partners sufficient funds for them to pay off the loans to Black Rock and International Coal. The loans were structured in such a way that money loaned by GPL to Dynarad and LCB ended up being loaned to Cal-Am partnerships in which Laird was the noncorporate general partner. The loans by GPF to Dynarad and Sun River ended up being loaned to Cal-Am partnerships in which Fisher was the noncorporate general partner. [6] The circular flow of loans and checks was so complicated that it was necessary for Laird to provide the bank personnel handling the transactions with a flow chart and directions to manage the account. A summary of checks, for a three-day period from November 29 to December 1, 1976, drawn upon the accounts of Cal-Am related entities is as follows: No. of
Account
Amount
Checks
International Coal TAC
$ 64,857,200
12
Joseph R. Laird
46,792,500
95
GPF Coal Invest.
44,493,000
8
Sun River Ranches
6,609,000
14
Black Rock TAB
60,423,036
10
Kenneth J. Fisher
36,316,936
96
GPL Specialized Invest.
29,864,736
7
LCB Ranch
7,049,600
32
Legal Mortgage Corp.
23,847,610
218
Dynarad LMC T/A
63,143,520
155
Cal Am Investors Acct II
24,244,416
175
Cal Am Mineral P'ship Acct
4,124,736
46
Cal Am Disb. Acct
220,300
1
Dixie Natural Resources
33,050
221
Allstate Securities
250,000
2
J.R. Forbes #024728
98,244
180
Cal Am Investors Acct
- 0 -
0
J.R. Forbes #064352
27,904
41
214 Partnerships
101,377,820
389
TOTALS
$ 513,773,608
1,702
*145 The cumulative balances of the accounts on November 28 and December 1, 1976, were $ 2,500,172.68 and $ 10,388,487.83, respectively. The difference between November 29, and December 1 reflects contributions by limited partners of over $ 7,400,000. The ability of the entities to write checks in 1976 in the amount of $ 513,773,608, far in excess of the actual or real funds present, was due to an elaborate check swapping scheme. All of the money, except a 10 percent commission to Allstate and expenses paid by the limited partnerships, went to Black Rock or International Coal. Black Rock and International Coal eventually received approximately $ 25,000,000 from the limited partnerships. These funds were invested in preferred stock of Kings Point Corporation which used the money to purchase a movie studio in Culver City, California, and condominiums in Hawaii. Kings Point Corporation eventually went into bankruptcy. In 1978, Laird, through a novation of the loans, caused LCB, Sun River and Dynarad to assign the notes of the limited partnerships to Black Rock and International Coal. The partnerships were exonerated from the payment of interest due on the notes. At the same *146 time LCB, Sun River and Dynarad, which had borrowed from GPL and GPF the necessary funds to lend money to the partnerships, were forgiven the principal and interest due and owing on loans from GPL and GPF. This collapsed the circular flow of funds so that the Cal-Am partnerships owed the principal to Black Rock and International Coal. Income Tax Returns
In 1976 each partnership return reported zero income. Each partnership reported a loss of $ 287,500 [7] which was entirely attributable to advanced coal royalty payments. In 1977 each partnership reported "guaranteed operating income" in amounts ranging between $ 2,500 and $ 2,700. Thereafter, the partnerships reported no income and no losses. Coal Mining Activities
The partnerships never engaged in coal mining activities. No coal was ever commercially mined or produced. Laird testified that the partnerships were not formed to operate coal mines but were to hold the leases for investment. The Offering Memorandum and Coal Report that Cal-Am released stated that contract miners would be employed to work the leased mines. It was expected that one of three *147 methods of mining would be used: open pit mining, underground mining, or gasification. Open pit mining, also known as strip mining, requires that the overburden (earth lying on top of the coal) be removed by a drag line. The coal is then removed by power shovel, front-end loader, and trucks. The primary expense of this form of mining is the drag line, a machine which can cost in excess of $ 5,000,000. An added cost is that open pit mining requires that a ramp be built for the trucks to haul the coal out of the pit. Also, adjacent land must be used to slope the pit walls to prevent cave-ins. Underground mining requires that a shaft be tunneled down to the seam of coal. Beyond the costs incurred in sinking the shaft and tunneling, the primary deterrent to this type of mining is that it requires that half of the coal be left unmined to provide support for the ground above. Otherwise, the ground settles, leaving large craters. Finally, Cal-Am suggested that the coal could be recovered by gasification. This method was experimental and was not during the time in issue used in a commercial setting. It is evident from the amounts of coal reserves available, the quality of the *148 coal subject to the leases, and the costs of each type of mining that the coal subject to the leases cold not be economically mined. Furthermore, it would be impossible for the partnerships to achieve economies of scale by joining their leases together because the Private Offering Memorandum states that "the General Partner, acting on behalf of the instant partnership, will not enter into any transaction with any other limited partnership in which the General Partner or its affiliates has an interest." Each partnership, therefore, would bear the full duplicate cost of opening each mine. OPINION These cases are representative of 296 coal mine leasing limited partnerships ( Cal-Am partnerships). The facts in these cases are essentially identical. Certain petitioners in related docketed cases have agreed to be bound by the determination reached in these cases. As a preliminary matter, we note that the statute of limitations does not act as a bar to the assessment of the deficiencies. Each petitioner signed timely Consents to Extend the Time to Assess Tax, Form 872, and Special Consents to Extend the Time to Assess Tax, Form 872A, in accordance with section 6501(c)(4) and the *149 regulations promulgated thereunder. We would parenthetically observe that it is the practice of petitioners' counsel, John Patrick Kelly, to routinely plead the statute of limitations, when there is no factual support for that claim. [8] See, e.g., Pittler v. Commissioner,T.C. Memo. 1986-320; Chao v. Commissioner,T.C. Memo. 1985-444; Rosebrough v. Commissioner,T.C. Memo. 1985-339. Petitioners claim deductibility of their distributive share of the Cal-Am partnerships' 1976 losses, which allegedly consisted of advanced royalty payments. The availability of those deductions turns on whether the transactions were bona fide arm's-length transactions entered into for profit for Federal income tax purposes. Respondent's primary argument is that these transactions were conducted solely for the purpose of generating tax deductions and thus should be disregarded for tax purposes. Respondent also contends that there was no profit objective under section 183 for the acquisition of the coal mining leases. Alternatively, respondent argues that the leases were not entered *150 into before Treasury announced new regulation section 1.612-3(b)(3), which provides that advanced royalty payments only can be deducted in the year the mineral product is sold. We agree with respondent's primary argument that the transactions were devoid of economic substance and thus are to be disregarded; therefore, we do not independently address respondent's alternative arguments [9] although we do consider some of them in our holding on the economic substance theory. Transactions that lack economic substance and are conducted for the sole purpose of reducing tax liability are disregarded for tax purposes by the courts. Knetsch v. United States,364 U.S. 361 (1960); Falsetti v. Commissioner,85 T.C. 332 (1985). It is the economic substance of a transaction that controls for Federal tax purposes. Gregory v. Helvering,293 U.S. 465 (1935); Grodt v. McKay Realty, Inc,77 T.C. 1221, 1226 (1981). We recently *151 formulated a method for determining if a "generic tax shelter" is devoid of economic substance and entered into without a profit motive by examining certain objective factors which tend to indicate whether or not the disputed transaction has reality. Rose v. Commissioner,88 T.C. 386 (1987). In Rose we defined a "generic tax shelter" as having the following characteristics: (1) tax benefits are the focus of promotional material; (2) the investors accept the terms of the purchase without price negotiations; (3) the assets in question consist of packages of purported rights difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets are acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration is deferred by promissory notes, nonrecourse in form or substance. Rose v. Commissioner, supra at 412. These cases involve, at least to some extent, all of the above characteristics. Consequently, they are "generic tax shelters" and we must decide whether the transactions have any economic *152 substance, considering objective factors found to be relevant under section 183, along with the concepts underlying sections 38, 162, 167 and 212. Rose v. Commissioner, supra at 414-415. We will consider, therefore, whether the activities of the Cal-Am partnerships and the other Laird-controlled entities tend to show a profit objective, the relationship between the amounts paid by the partnerships to the fair market value of their investments, and the structure of the financing used in the transactions. These determinations are made at the partnerships level. Brannen v. Commissioner,722 F.2d 695, 703-704 (11th Cir. 1984), affg. 78 T.C. 471, 501-505 (1982). Partnership Activities
A close examination of the entities involved here reveals a complete lack of arm's-length dealing. See Karme v. Commissioner,73 T.C. 1163, 1186 (1980), affd. 673 F.2d 1062 (9th Cir. 1982). As indicated in our findings of fact, Laird and Fisher exercised control over every entity associated with the transactions in issue. Together, or individually, they represented virtually every entity involved in the leases and advanced *153 royalty payments. For example, they executed documents on behalf of the lessors (Black Rock and International Coal), the lessees (Cal-Am partnerships), the lenders (Sun River, LCB and Dynarad), and the borrowers (Cal-Am partnerships). Virtually every document was signed by Laird or Fisher. Petitioners made much ado about the fact that money moved from a Laird controlled corporation to a partnership in which Fisher was the general partner and from a Fisher controlled corporation to a partnership in which Laird was the general partner. Petitioners argue that this shows that the transactions were between unrelated parties. However, we are not impressed by these machinations. Laird and Fisher had a long history of working together. They became each other's alter ego. The structure of the entities was on a massive plan. We, therefore, shall treat Fisher and Laird as one and the same. Accordingly, contrary to petitioners' position, there were no negotiations among the entities. In fact, most of the transactions involving the parties were prearranged and laid out in detail in the offering memorandums that petitioners received. Even the memorandums discussed the existence of common *154 control among the entities. The lack of arm's-length dealing is also indicated by the structure of the leasing arrangements. The transfer of the leases from DNR to PC Development without any consideration except for consultation by PC and an agreement to sublease the properties to Black Rock and International Coal would not have occurred between parties dealing at arm's length. PC Development did not pay anything for the leases and did not receive any payment from Black Rock or International coal for the subleases. PC Development was merely integrated into the transaction to create the fiction of a disinterested third party. Laird testified that nothing had to be paid to PC Development until after production began. PC Development was protected from liability to the original lessors through an overriding royalty which would have to be paid if any production occurred. As such, PC Development's lack of pecuniary involvement makes its involvement inconsequential. More damaging than the PC Development connections was Black Rock and International Coal's unfortunate habit of transferring to the partnerships leases to which they did not hold legal title. Black Rock transferred leases, *155 which it was still negotiating to purchase, to the partnerships to create the necessary number of partnerships and to predate the release of new regulations under section 612 which prohibit the deduction of advanced royalty payments until the coal is sold. If these were truly arm's-length negotiations, the partnerships would never have agreed to enter into the leases with a company which did not have legal title to the underlying property. In the end, the leasing arrangement between PC Development, Black Rock, International Coal, and the Cal-Am partnerships became so burdensome that Laird felt it was necessary to have all the leases under the control of one entity, Attorney's Title Company. This also served to portray all the partnerships as one entity. However, this was merely window dressing, added by the controlling partners, because the partnerships still could not act as one to develop their mines. The partnership agreements which stated that the general partners would not deal with other Cal-Am partnerships were still in effect and were not altered to allow such interactions. In addition, the novation of the loans between Black Rock, International Coal, Sun River, LCB, *156 Dynarad, GPL, GPF, and the Cal-Am partnerships indicate that the transactions were not at arm's length. Laird handled each side of each novation. He acted as the representative for the borrower and the lender. He was, therefore, able to rewrite the loans and forgive interest already due and owing, without negotiations. In explaining his actions, Laird testified that the purpose of the novation was to relieve the partnerships of the burden of large amounts of interest. However, he was unable to clearly explain the benefit to the lender. Laird testified that the lenders were willing to forgive the interest because the lender in turn was going to be forgiven on the debt owed to either GPF or GPL. This caused the circular flow of financial transactions that Laird created in 1976 to collapse upon itself in 1979, all at his direction. In effect, it was as if all the intermediate loans never existed except on paper. The partnerships owed Black Rock and International Coal upon the notes for the advanced royalty payments just as they had at the outset of the transactions. Independent parties would not have willingly accepted the terms of the novations. The absence of arm's-length dealing *157 indicates that Laird and the partnerships were not overly concerned with the probability of profit. True arm's-length dealings are a cornerstone for building profitability. Arm's-length dealings subject every decision to two sided discussions and differences of opinion which make business judgments sharper and create opportunities for bargain purchases. If the partnerships were truly concerned with profits, then the partnerships would have scrutinized each step in the transactions to maximize profits. Instead, the main concern seems to have been the creation of a format which could withstand scrutiny by respondent. Furthermore, the promotional materials indicate that the partnerships were not motivated by profit potential. The prospectus makes substantial allusions to tax savings and a tax write off of 3-1/2 to 1. Additionally, the prospectus states that a suitable investor needs to be in at least a 50 percent tax bracket. An investment which is profit-oriented does not require that the taxpayer be in a high tax bracket. Such a requirement suggests that the only way in which the investment can be beneficial is through tax benefits, rather than profits. Finally, the partnerships' *158 actions after the initial purchases also indicate an indifference to any profits which may have been derived from the coal leases. The record discloses that no attempts were made to find contract miners to operate the mines or to market the leases to take advantage of any appreciation in the leases. No coal was actually produced. The only subsequent action after the initial purchases was the transfer of all the leases to another Laird controlled organization. This is clearly reflected in the returns of the partnerships which indicate that the only income that the partnerships had was "guaranteed operating income." As we noted before, this was merely an attempt at window dressing and at reducing the structural load of maintaining all the leases and subleases. Relationship Between Cost and Fair Market Value
The fair market value of the leases did not approach the amount the partnerships paid to acquire the properties. The leases had recently been purchased from a third party in a true arm's-length transaction by DNR for Black Rock and International Coal for approximately $ 220 to $ 500. Shortly thereafter the same leases were sold to the partnerships for $ 287,500. In some *159 of the sales, the partnerships purchased the leases for $ 287,500 from Black Rock before Black Rock had acquired them for between $ 220 and $ 500. The inflated purchase price paid cannot be supported by any expected income from the coal to be mined. Respondent's expert witness testified that the coal could not be mined economically. The expert's report reflects that most of the leased property that was stripable did not have seams deep enough to support a strip mining operation and the property which was suitable for underground mining generally did not contain sufficient reserves to leave half the coal in place to act as surface support. The expert also testified that most of the coal on the Wyoming properties was subbituminous-C which is an inferior grade of coal because of its low heating value. The coal on the Colorado leases had so high a sulfur content that a nearby coal fired electrical plant would not use that coal because of the added cost of scrubbing the sulfur from the coal. Petitioner's meager cross examination of the expert witness did not in any way detract from his expert opinion. Accordingly, we fully accept his testimony and conclude that insufficient income *160 could have been produced to cover the cost of mining and production, let alone produce a profit. It is also apparent from Laird's cavalier attitude toward assigning particular leases to individual partnerships that the actual operation or resale of the leases did not play a significant role in the formation of the partnerships. Neither Laird nor anyone associated with the partnerships made on site investigations of the coal reserves available in all the leased property. The leases were assigned based upon the oral reports of a geologist and an engineer whose reports were based upon geological charts and prepared reports. No core drilling or any other form of survey were performed on the leases. The estimated reserves in the property were merely accepted at face value. The partnerships could not have been interested in the fair market value of the property or they would have investigated more closely. Also, the partnerships would have been assigned contiguous leases so that duplicate costs of mining could have been avoided. Instead, Laird simply selected leases and a figure which produced the desired tax results without determining the leases' fair market value. Petitioners' *161 failure to establish that the price paid for leases reflected fair market value is "lethal" to petitioners' case. Karme v. Commissioner,73 T.C. at 1190. Structure of the Financing
The initial structure of the advanced royalty payment principally was in the form of a nonrecourse debt. Such debt is an indicia of a lack, or exaggeration, of economic substance. Rose v. Commissioner, supra at 419. The novations and the subsequent treatment of the notes further indicate that the notes were merely paper transactions. Any shadow of substance to the financing is further dissipated by the circular cash flow employed by Laird to create a flourish of financial activity. Payments in the form of swapping checks or other types of exchange have been disregarded by the courts. Knetsch v. United States,364 U.S. 361 (1960); United States v. Clardy,612 F.2d 1139 (9th Cir. 1980). Circular transfers of money to create the illusion of payments indicate the presence of a transaction lacking economic substance. Karme v. Commissioner,73 T.C. at 1186-1187. In this case there is evidence of a gigantic *162 circular money flow as indicated by the transactions which occurred between October 27 and December 31, 1976. It was necessary for Laird to provide Cal-Am employees and bank personnel with elaborate directions for the purpose of processing the massive flow of checks during a short time period. Cal-Am partnerships deposited investors contributions and checks representing loans and simultaneously wrote checks for advanced royalties. The checks drawn on the partnerships' accounts were far in excess of the partners' contributions. The checks were based upon loans provided by Laird controlled entities. In fact, after all the transactions had been completed, the only change of substance in the bank account of the partnerships was a shift of the partners' cash contribution to other Laird controlled entities and eventually to Kings Point. The notes used to keep the investors' check swap flowing did not constitute adequate consideration as petitioners contend. Primarily they were collaterized by the leases. The leases did not have any proven value. Furthermore, the leases only ran for seven years whole the notes ran for 22 years. After the leases had expired the notes would not be collateralized *163 by any property. The loans were merely another link in the paper chain. In United States v. Clardy, supra at 1152, involving claimed payments for deductible interest, the Ninth Circuit stated: By swapping worthless checks which nevertheless offset each other and by securing the cooperation of a friendly bank, they managed to get the checks entered as debits on the relevant bank accounts. It would be difficult, to say the least, for anyone to believe in good faith that this amounted to a payment of interest.
As in Clardy, we refuse to give Laird's "financial fantasies" encompassing check and loan swapping, any credence. See Saviano v. Commissioner,765 F.2d 643, 654 (7th Cir. 1985), affg. 80 T.C. 955 (1983). The check and loan swapping mechanism was no more than a superficial payment structure created solely to reap tax benefits. See Battlestein v. Commissioner,611 F.2d 1033, 1035 (5th Cir. 1980). See also Beck v. Commissioner,74 T.C. 1534, 1562-64 (1980), affd. 678 F.2d 818 (9th Cir. 1982), and Pittler v. Commissioner,T.C. Memo. 1986-320 where taxpayers' *164 partnerships were denied claimed interest deductions for alleged payments pursuant to a similar Laird designed financial scheme involving some of the same entities involved in this case. Upon a full review of this record, we conclude that the Cal-Am partnerships' activities and alleged advanced royalty payments were devoid of economic substance. Petitioners, therefore, may not deduct on their Federal income tax returns for the periods in issue amounts allegedly paid as advanced royalties. Decision will be entered for respondent in each of the above-docketed cases except for the case at docket No. 13780-83. Decision will be entered under rule 155 in docket No. 13780-83.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Cesar O. Santos and Mary Ann Santos, docket No. 12433-83; Richard J. Montano and Elaine G. Montano, docket No. 13481-83; Stanley R. Biart and Gail E. Biart, docket No. 13485-83; Robert N. Keefer and Edna C. Keefer, docket No. 13487-83; Peter R. Obligato and Janice A. Obligato, docket No. 13780-83; Donald C. Knox and Margaret M. Knox, docket No. 15619-83; Roger A Mann and Joan W. Mann; docket No. 16052-83; Faustino M. Gayo and Consuelo C. Gayo, docket No. 16068-83; John P. Sanders and Maureen W. Sanders, docket No. 17051-83; Logan J. Scroggy, docket No. 17054-83; Cecil E. Leidle and Patricia L. Leidle, docket No. 19106-83; Marvin L. Ohs and Dixsia L. Ohs, docket No. 19109-83; Alan A. Fisher and Leona M. Fisher, docket No. 19824-83; Walter L. Stilson and Grace Stilson, docket No. 23118-83; David G. Torre and Jessica Torre, docket No. 24420-83; George D. Hendrix and Lorraine R. Hendrix, docket No. 24422-83; and William J. Duxbury and Joanne C. Duxbury, docket No. 32769-83. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. Cecil and Patricia Leidle, docket No. 19106-83, also claimed a deduction in 1975 for distributive losses from Calco Drilling Company, an unrelated coal leasing operation. This issue and the deficiencies for 1973-1974 were not raised at trial and are therefore deemed to have been abandoned. Peter and Janice Obligato, docket No. 13780-83, filed settlement documents as to their 1977 and 1978 tax years. A Rule 155 computation will be necessary in that case. ↩
4. In other offerings the lender was either LCB, Sun River, or Dynarad. ↩
5. DNR acted as corporate general partner for some of the other limited partnerships. ↩
6. This financing structure was similar to the one utilized by Laird and Cal-Am in real estate tax shelters in 1974 and 1975. See Beck v. Commissioner,74 T.C. 1534, 1545-1547 (1980), affd. 678 F.2d 818 (9th Cir. 1982), and Pittler v. Commissioner,T.C. Memo. 1986-320↩. 7. The Mobridge Company reported a loss of $ 322,500. ↩
8. The Obligatos did not raise the statute of limitations issue. ↩
9. The parties disagreed about whether the partnerships were cash or accrual basis taxpayers. We do not need to reach this issue because we have based our decision on respondent's economic substance theory. ↩