BARMAG BARMER MASCHINENFA-
BRIK AG, Appellant,

v.

MURATA MACHINERY, LTD., and Mu-
rata of America, Inc., Appellees.

Appeal No. 83–1112.

United States Court of Appeals,
Federal Circuit.

March 26, 1984.

**832**

Charles B. Park, III, Charlotte, N.C., argued for appellant. With him on the brief were Joell T. Turner, James D. Myers, Charlotte, N.C., and Stuart Lubitz, Los Angeles, Cal.

Wayne Willenberg, Los Angeles, Cal., argued for appellees. With him on the brief was Stuart Lubitz, Los Angeles, Cal.

Before MILLER, Circuit Judge, COWEN, Senior Circuit Judge, and NIES, Circuit Judge.

NIES, Circuit Judge.

This appeal is from the judgment of the United States District Court for the Western District of North Carolina (McMillan, J.)[1] holding U.S. Patent No. Re. 30,159, owned by Barmag Barmer Maschinenfabrik AG, invalid under 35 U.S.C. § 102(b). Barmag, a West German corporation, had sued Murata Machinery, Ltd., a Japanese corporation, and its U.S. subsidiary (collectively "Murata"), charging the defendants with infringement in marketing certain textile processing machines asserted to be covered by the patent. The patent statute prohibits the grant of a patent for an invention which was "on sale" in the United States more than one year prior to the filing date of a U.S. patent application.[2]

---

1. Reported at 559 F.Supp. 491, 217 USPQ 1026 (W.D.N.C.1983).

2. 35 U.S.C. § 102(b) provides, in pertinent part:

A person shall be entitled to a patent unless ... the invention was in public use or on sale in this country, more than one year prior to

On a motion by Murata for summary judgment, the court held that Barmag's patent was invalid under this statutory time bar.

Barmag asserts that summary judgment was improvidently granted because genuine issues of material fact remain to be tried, and that, in any event, the district court erred as a matter of law in its conclusion that the invention was "on sale" within the meaning of the statute before the critical date. Barmag's primary contention is that the invention had not yet been reduced to practice by that date and, thus, could not have been "on sale."

Our jurisdiction over this appeal is provided by 28 U.S.C. § 1295(a)(1).

We find no merit in appellant's arguments and affirm the decision below.

### Background

The invention in suit is directed to a machine for processing filament yarn. Synthetic yarn is manufactured from molten plastic material by an extrusion and stretching process which results in a smooth and straight rodlike filament. To add a texture more like natural fibers, filaments may be subjected to a crimping process, which requires twisting over heat, then cooling to set the crimps. The crimping process was at one time entirely separate from stretching (also known as "drawing") the filaments. However, the process was altered by the development of false-twist crimping machines, which utilize partially drawn yarn and are able to perform the final drawing and texturing steps at high speeds.

Prior to the development of the claimed apparatus, false-twist crimping machines were typically constructed with vertically oriented heating and cooling zones through which the yarn passed upwardly. The conventional wisdom throughout the industry was that quality draw texturing could only be accomplished at the desired high speed if the yarn was maintained in a substantially straight-line path through the heating and cooling zones.

To permit higher speed operation, the length of the heating zone of such machines had to be correspondingly increased in order for the yarn to reach the necessary temperature during processing. As a consequence, such machines became increasingly tall, reaching 17 or 18 feet, until they exceeded the ceiling height limitations in many existing plants. Manufacturers were faced with either relocating to new plants or modifying their facilities to accommodate the very tall machines.

Appellant Barmag is a leading manufacturer of false-twist crimping machines. Heiman Kubler is manager of research and development of false-twist equipment for Barmag and the inventor named in the patent in suit. Anticipating that height limitations would be a major problem to further increasing the speed of processing, Kubler, in 1973, suggested changing the machine's profile. Kubler's proposal was to rearrange the components of conventional false-twist crimping machines in an unconventional manner. His invention, which is claimed in Re. Patent No. 30,159, calls for an upwardly slanting heating zone, an acute turn in the yarn path between the heating and cooling zones, and a vertically oriented cooling zone. A German patent application on the angled arrangement was filed on July 5, 1975. The corresponding U.S. patent application was filed on June 30, 1976.

The activities of Barmag, which give rise to the specific issue of an "on sale" bar, concern negotiations conducted in the United States and Europe by Barmag and American Barmag, its U.S. subsidiary for sales and servicing, with a third party, the U.S. company, Burlington Industries, Inc. The negotiations occurred between January 1974 and June 30, 1975, and resulted in an order by Burlington for two machines on July 18, 1975. Proof of these activities was established principally through depositions of personnel of Barmag and Burlington taken by appellee Murata. At the conclusion of discovery, Murata moved for summary judgment. Barmag requested, and

the date of application for patent in the United States.

was granted, additional time to respond to the motion. A number of memoranda analyzing the record and the law were prepared for the court by both parties. After a hearing, Judge McMillan issued an opinion detailing the evidence of record and the legal standard for determining the existence of a statutory time bar to the patent. Finding no genuine issue of material fact, the court held that under the standard of the Court of Customs and Patent Appeals, as well as that of various circuits, the facts established that Barmag had engaged in sales activities of the patented machine in the United States before June 30, 1975, which invalidated the subject patent. Barmag challenges the court's judgment, requesting a remand for a jury trial.

## I

In January 1974, Mr. de Haas of American Barmag, vice-president in charge of sales and service, met with certain personnel of Burlington Industries at the Burlington facilities in North Carolina. Mr. de Haas testified that during this meeting Burlington indicated that it needed approximately 90 to 95 false-twist machines over a three-year period but could not utilize standard Barmag machines because of their height. He conveyed this information to Barmag management in Europe.

The district court opinion sets out the following additional recitation of events:

At a meeting in Germany on December 3, 1974, Barmag presented Burlington with a proposal for a slanted heater machine which conformed to Burlington's height requirements. A technical diagram of the machine was forwarded to Burlington in High Point, North Carolina, on December 13, 1974. This slanted heater machine was also known as the "low profile" machine, and later called the "FK6–SS" or "FK6–L" machine.

At the December 3, 1974, meeting, Barmag agreed to construct a slanted heater machine for Burlington to evaluate in March or April of 1975. It was further agreed that if Burlington placed an order for the machines by early May, 1975, Barmag would deliver two full production machines in December 1975, followed by five such machines every month thereafter.

On December 18, 1974, a follow-up meeting was held at Burlington's facilities in Greensboro, North Carolina, to discuss the price of the machines. Present at that meeting were Harry de Haas, vice-president of sales for American Barmag; Edwin Robbins, vice-president of research and development of the Klopman textured woven division of Burlington; Theodore Lide, vice-president of manufacturing at Burlington; and Ralph Harwood of the purchasing department at Burlington.

Barmag completed construction of the machine in March 1975. Photographs of the machine were sent to Burlington in Greensboro in March, 1975.

A detailed quotation for the slanted heater machines was sent to Ralph Harwood, a purchasing agent at Burlington, on April 8, 1975. This quotation (Defendant's Exhibit 11) contains an eleven-page description of the machine, quantity (25 machines), price ($346,900 per machine), delivery and payment terms, and warranties and limitations. The quotation was sent under a cover letter signed by Harry de Haas, vice-president of sales at American Barmag.

On April 9, 1975, at a meeting at American Barmag in Charlotte, Burlington reconfirmed its intent to purchase Barmag's slanted heater machine. Another meeting was held in Greensboro on May 22, 1975, for further negotiations of the payment, delivery, warranty, and other terms of Burlington's purchase of Barmag's slanted heater equipment. (Harry de Haas, vice president of sales at American Barmag, testified that "this was not a technical meeting; this was a sales meeting that had to do with the price structure, the discounts, the time of deliveries, the warranties ... ironing out little details" (Dep. pp. 38–39).

Burlington personnel tested and evaluated Barmag's machine in Germany from

June 2 through June 16, 1975. On June 13, 1975, another detailed quotation (Defendant's Exhibit 12) was sent to Theodore Lide, as director of purchasing at Burlington, from Harry de Haas, vice-president of sales at American Barmag. This quotation included various agreements on payment, time tables for delivery, 13 pages of specifications on the machine, estimated spare part usage, and life expectancy of the various parts. Lide considered the quotation to be a sales offer which would be binding on acceptance by Burlington (Dep. pp. 52–53).

On June 30, 1975, American Barmag placed an order with Barmag for two of the full production low-profile machines to be delivered to Burlington (Defendant's Exhibit 13), which was confirmed by a written purchase order from Burlington dated July 18, 1975 (Defendant's Exhibit 14). Construction of the first low-profile machine was completed in January, 1976; that machine was tested in Germany before two machines were delivered to Burlington in March, 1976.

After consideration of precedents of each of our predecessor courts, the district court then utilized the test of *Timely Products Corp. v. Arron*, 523 F.2d 288, 302, 187 USPQ 257, 267–68 (2d Cir.1975) for determining when an offer of sale of equipment to be manufactured started the running of the statutory time period for filing a U.S. patent application. In accordance with the three requirements of *Timely Products*, the court found:

1. The invention of the '159 patent was embodied in the machines offered for sale to Burlington.

2. The invention of the '159 patent was reduced to practice and operable before June 30, 1975.

3. The machines were on sale for profit, not for experimentation.

The final conclusions of the district court are summarized as follows:

Based on the evidence in the record, this court finds that there is no genuine issue of material fact. The assembly described in the '159 patent is the machine offered for sale to Burlington in the quotations and meetings that occurred before June 30, 1975. The sale was for commercial exploitation of the invention which had been shown to be operable and commercially viable.

As a matter of fact and a matter of law, this court finds that Patent No. Re. 30,159, held by plaintiff Barmag, is invalid under 35 U.S.C. § 102(b) because the device claimed in the patent was "on sale" in the United States more than one year before the patent application was filed. Accordingly, defendants' motion for summary judgment is allowed.

## II

The basic issue raised by Barmag's appeal is whether the district court erred in holding that there was no genuine issue of material fact for trial. Before reviewing the evidentiary argument, it is necessary to consider several preliminary matters.

Barmag asserts that patent cases generally are inappropriate for summary judgment disposition. We disagree. Summary judgment is as appropriate in a patent case as in any other. Where no genuine issue of material fact remains and the movant is entitled to judgment as a matter of law, the court should utilize the salutary procedure of Fed.R.Civ.P. 56 to avoid unnecessary expense to the parties and wasteful utilization of the jury process and judicial resources. In the past year this court has specifically affirmed the grant of summary judgment in the following patent cases: *Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 220 USPQ 584 (Fed.Cir.1984); *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 219 USPQ 13 (Fed.Cir.1983); *Chore-Time Equipment, Inc. v. Cumberland Corp.*, 713 F.2d 774, 218 USPQ 673 (Fed.Cir.1983).

A critical factor in a motion for summary judgment in a patent case, as in any other, is the determination by the court that there is no *genuine* issue of *material* fact. With respect to whether there is a

genuine issue, the court may not simply accept a party's statement that a fact is challenged. *Union Carbide Corp. v. American Can Co.,* 724 F.2d at 1571, 220 USPQ at 588. The party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant. Mere denials or conclusory statements are insufficient.

On the other hand, the established facts, as well as any inferences of fact drawn from such facts, must be viewed in a light most favorable to the opposing party. *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

The *materiality* of facts is viewed in light of the legal standard to be applied to the case.

### III

With respect to the legal standard for determining whether an invention was on sale, Barmag argues that the *Timely Products* test utilized by the district court is limited in application to a situation in which commercial quantities of the invention have been promoted and sold prior to the critical date and that the court should not, therefore, have applied that standard here where only a makeshift machine was in existence.

Contrary to Barmag's view, the *Timely Products* test is *specifically* directed to determination of the existence of a bar where the offer to sell concerns articles which have not been produced at the time the purchase is solicited. As stated therein:

> We accordingly conclude that Section 102(b) bars an application for patent filed more than one year after the solicitation of an order for *a specific article to be produced later,* where the following req-

uisites are present: .... [Emphasis added.]

523 F.2d at 302, 187 USPQ at 267.

Moreover, the *Timely Products* court considered and rejected the more restrictive "on hand" test proposed here by Barmag as the appropriate standard. For an invention to be on sale under the "on hand" rule, "a device incorporating the invention must have existed in its ordinary or contemplated usable form, and must have been on hand and ready for delivery more than one year prior to the patent application filing date."[3]

■ The *Timely Products* court endorsed the criticism that application of the "on hand" test often produces results contrary to the basic policies underlying the on sale bar.[4] One of the primary purposes of section 102(b) is to preclude commercial exploitation of an invention which has the effect of expanding the period of exclusive rights granted by the statute. *General Electric Co. v. United States,* 654 F.2d 55, 61, 228 Ct.Cl. 192, 211 USPQ 867, 873 (1981). Indeed, the policies which underlie the public use or on sale bar, in effect, define the terms of the statute. *TP Laboratories, Inc. v. Professional Positioners,* 724 F.2d 965, 973, 220 USPQ 577, 583 (Fed. Cir.1984). Offers to sell can be made whether or not products are actually on hand, and we reject Barmag's position that an inventory of products should be made a requirement of the legal standard. It is no more than a factor to be taken into consideration.

In any event, the standard of *Timely Products* was generally approved by a predecessor of our court although only the first of the requirements was at issue in that case. *In re Corcoran,* 640 F.2d 1331, 1333–34, 208 USPQ 867, 870 (CCPA 1981).

---

**3.** *Galland-Henning Mfg. Co. v. Dempster Bros.,* 315 F.Supp. 68, 80, 165 USPQ 688, 696 (E.D. Tenn.1970); *see also B.F. Sturtevant Co. v. Mass. Hair & Felt Co.,* 124 F.2d 95, 51 USPQ 420 (1st Cir.1941), *cert. denied,* 315 U.S. 823, 62 S.Ct. 917, 86 L.Ed. 219 (1942); *Burke Elec. Co. v. Independent Pneumatic Tool Co.,* 234 F. 93 (2d

Cir.1916), *cert. denied,* 241 U.S. 682, 36 S.Ct. 728, 60 L.Ed. 1234 (1916); *McCreery Eng. Co. v. Mass. Fan Co.,* 195 F. 498 (1st Cir.1912).

**4.** *New Guidelines for Applying the On Sale Bar to Patentability,* 24 Stan.L.Rev. 730, 744 (1972).

The district court, thus, correctly chose to follow precedent of this court.[5]

■ The *Timely Products* standard, while requiring less for "on sale" activity than the "on hand" test, is, nevertheless, restrictive in that an offer to sell, without the existence of a physical embodiment of what is offered, does not start the running of the time period. It is not difficult to conceive of a situation where, because commercial benefits outside the allowed time have been great, the technical requisite of *Timely Products* for a physical embodiment, particularly for a simple product, would defeat the statutory policy and we, therefore, do not adopt the *Timely Products* test as the answer in all cases. However, since the district court concluded that the test was met, and we agree, we need not consider whether a less stringent standard might be appropriate in this case.

### IV

Barmag does not dispute that the series of events quoted from the district court opinion in fact occurred. Rather, it argues that the district court drew "inferences" from the facts adverse to its position, which is improper on a motion for summary judgment. However, on significant matters Barmag confuses inferences of fact with legal conclusions. Illustrative of this confusion are its assertions that the question of whether the "invention is 'on sale' is a question of fact," and that "reduction to practice is a material fact vis-a-vis the 'on sale' bar." Neither of these issues is itself a fact nor an inference of fact drawn from established facts. *In re Corcoran*, 640 F.2d at 1333, 208 USPQ at 869 (one-year time bar applied under "principles of law"). *D.L. Auld v. Chroma Graphics, Corp.*, 714 F.2d at 1151, 219 USPQ at 18 (reduction to practice is "a legal conclusion"). What Barmag is actually contesting is the court's conclusion on each of these legal issues.

In any event, we have reviewed appellant's position by focusing our attention on what conflicting evidence, if any, Barmag proffered on the factual issues, whether any genuine issues were raised as to facts which are material, and whether the undisputed facts satisfy the appropriate legal standard.

### V

#### A

■ On the issue of whether Barmag sent an offer to sell to Burlington on June 13, 1975, Barmag attempts to raise an issue of fact by pointing to *Burlington's* subsequent purchase order of July 14, 1978, which, by its terms, is an *offer* to purchase. The district court held: "Burlington's subsequent purchasing order does not convert the June 13, 1975, quotation into a 'working paper'." We agree that the fact of Burlington's counter offer to purchase does not create a disputed fact that the detailed quotation of June 13, 1975, was an *offer to sell* made by Barmag.

Barmag points to the case of *Poole v. Mossinghoff*, 214 USPQ 506 (D.D.C.1982), as "quite analogous factually to the situation presented here." In *Poole*, a research and development contract with potential purchasers of a video tape recorder led to development of a prototype. It was argued that a demonstration of the prototype was in itself an offer to sell, a position rejected by the *Poole* court. Contrary to Barmag's view, the decision here in no way conflicts with the rationale of *Poole*. The demonstration and testing of the Barmag machine was not treated by the district court as "an offer." Unlike the situation in *Poole*, a specific offer of sale was made at the time of the demonstration.

#### B

With respect to the three requirements under *Timely Products*, Barmag asserts that the first requirement necessitates a finding not only that the invention is embodied in the thing offered for sale, which Barmag does not dispute, but that the invention was "complete." The district court here did not make a specific finding that

---

**5.** *South Corp. v. United States,* 690 F.2d 1368, 1370, 215 USPQ 657, 658 (Fed.Cir.1982).

the invention was "complete" and, therefore, Barmag argues, the findings are insufficient. This argument deserves little comment.

The *Timely Products* court stated:

(1) The complete invention claimed must have been embodied in or obvious in view of the thing offered for sale.... Complete readability of the claim on the thing offered is not required because whatever is published (or on sale) more than one year prior to the filing of a patent application becomes part of the prior art over which the claim must be patentable. [Citations omitted.]

523 F.2d at 302, 187 USPQ at 267.

Barmag is latching onto a single word in a paragraph dealing with obviousness as well as anticipation. In context, the word "complete" can only mean each element of the claim must be found in the embodiment, or the invention as a whole must have been obvious therefrom. *In re Corcoran*, 640 F.2d at 1333–34.

■ We hold that the court did not err in failing to make a finding that the invention was "complete" under the first requirement. It is undisputed that the claims read on the embodiment of the device which was in existence prior to the critical date. Under the first requirement it is immaterial that the device was a makeshift or "Rube Goldberg" embodiment.

It is also immaterial that modifications were made in the machines actually delivered to Burlington, such as in the location of the creel. No change was made that concerns limitations in the claims.

C

The second requirement of *Timely Products* was stated as follows:

The invention must have been tested sufficiently to verify that it is operable and commercially marketable. This is simply another way of expressing the principle that an invention cannot be offered for sale until it is completed, which requires not merely its conception but its reduction to practice.

To negate satisfaction of this factor, Barmag focuses on the testing of the machine and argues that the tests prior to June 30, 1975, were insufficient to verify operability and commercial marketability as required by *Timely Products*.

■ We agree with the district court that *Timely Products* does not impose a requirement of commercial marketability in addition to a requirement for reduction to practice. The *Timely Products* court simply indicated that an invention is "operable and commercially marketable" once the legal requirements of reduction to practice are satisfied. Similarly, an invention is "complete" if reduced to practice.

■ There is no dispute that reduction to practice requires that an invention be "sufficiently tested to demonstrate that it will work for its intended purpose." *General Electric Co. v. United States*, 654 F.2d at 62, 211 USPQ at 872. On the other hand, "[t]here is no requirement for a reduction to practice that the invention, when tested, be in a commercially satisfactory stage of development." *Randolph v. Shoberg*, 590 F.2d 923, 926–27, 200 USPQ 647, 650 (CCPA 1979).[6]

■ As conflicting evidence on the requirement of successful testing, Barmag points to the testimony of its witness Dr. Bauer that "there were a lot of items which still have to be clarified and improved," and to the fact that additional tests were conducted on sample yarns in August 1975. Additionally, the machines actually built for Burlington were tested in Germany in early 1976 and tested again after installation in the United States. We agree with the district court that this evidence does

---

6. Various phrases concerning an advanced stage of development of a device in order to fall under the "on sale" bar have appeared in the opinions of some circuits. This has led commentators to opine that a dichotomy exists between interference cases and "on sale" cases with respect to the meaning of "reduction to practice." We discern no distinction in our precedents.

not raise an issue of disputed fact. The district court's analysis took this evidence into consideration in reaching its legal conclusions. No purpose would be served by a trial since only the correctness of the legal conclusion is being attacked, and we discern no error in the district court's application of the law to the undisputed facts concerning the reduction to practice issue.

Unrefuted evidence in the record that Barmag sent Burlington several fabric samples made from yarn produced by the machine demonstrates that the machine was operable and producing yarn by May 1, 1975. No other inference of fact is possible unless Barmag were to have proffered evidence that the yarn had not been made on the machine.

Barmag argues that the invention had no utility as of the critical date since the yarn being produced was of unsatisfactory quality. According to Barmag, unless the yarn produced by the invention was at least of the quality available from conventional machines, the invention was commercially worthless, and thus lacking in utility. Since section 101 of the patent statute requires that an invention have utility to be proper subject matter for patentability, Barmag continues, a device lacking in utility can never be reduced to practice.

▮ Barmag appears to be equating the utility requirement of 35 U.S.C. § 101 with commercial marketability. As indicated above, commercial marketability is not a requirement of reduction to practice. So long as Barmag's machine produced yarn, it had utility in the sense of § 101.

In any event, the district court was not satisfied that the machine had been reduced to practice simply by the fact that it produced yarn in May 1975 and that the machine at that time had "good prospects of duplicating or making yarns near [Burlington's] current product," according to proffered testimony. The court relied on the fact that Barmag thereafter invited a potential customer, Burlington, to test the machine, that after nine days of operation, Burlington found the yarn "of a quality we almost didn't dare to hope for," and that

based on these tests, Burlington placed an order amounting to three-quarters of a million dollars. To argue in the face of these facts that, because this matter is on a motion for summary judgment, the district court should have drawn an inference that the tests were unsuccessful or unsatisfactory, shows a misunderstanding of the truism that factual inferences must be drawn most favorably to the non-movant. The court was not faced with alternative inferences, success or lack of success, each supported to some extent by facts of record. Rather, Barmag had done no more than merely make a conclusory denial that the testing was successful.

### D

Barmag also argues that the invention was in an experimental stage until long after the critical date. As the Court of Customs and Patent Appeals stated: "The experimental exception applies only if the commercial exploitation is merely incidental to the primary purpose of experimentation to perfect the invention." *In re Theis*, 610 F.2d 786, 793, 204 USPQ 188, 194 (CCPA 1979). On this issue we need only comment that Barmag's argument primarily depends upon Barmag's erroneous premise that Murata had to establish "without factual controversy, that plaintiff's work with its lab apparatus was not primarily for experimental purposes."

▮ It is incorrect that the challenger of a patent must initially present evidence negating experimental use as part of its proof of an "on sale" bar. Rather, it is incumbent on the patent owner to come forward with evidence directed to showing an experimental purpose in order to bring that issue into the case. *D.L. Auld v. Chroma Graphics Corp.*, 714 F.2d at 1150, 219 USPQ at 17; *accord T.P. Laboratories, Inc. v. Professional Positioners, Inc.*, 724 F.2d at 971, 220 USPQ at 582. In a summary judgment proceeding, the patent owner need, of course, only appropriately put forth facts indicating an ability to come forward with the necessary evidence. *D.L.*

*Auld Co. v. Chroma Graphics Corp.,* 714 F.2d at 1150, 219 USPQ at 17.

 Before the trial court and before this court, Barmag was unable to point to proffered evidence supporting an inference that the offer for sale was for experimental purposes. At best Barmag showed that it lost money on the deal with Burlington and relocated some parts of the machine actually delivered. Such evidence raises no genuine issue of fact on this issue.

### VI

For the foregoing reasons, we hold that summary judgment was appropriate in this case. The district court correctly held that there was no genuine issue of material fact for trial and that the invention was on sale in the United States more than one year prior to the filing of the U.S. patent application. Accordingly, the judgment of the district court that the patent is invalid under 35 U.S.C. § 102(b) is *affirmed.*

AFFIRMED.