**TRANSPAC DRILLING VENTURE, 1983–2 by James M. DOBBINS, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 90–131T.**

United States Court of Federal Claims.

Feb. 28, 1995.

See also 26 Cl.Ct. 1245.

Arthur H. Boelter, Boelter & Gale, Seattle, WA, for plaintiff.

William K. Drew, Tax Div., Dept. of Justice, Washington, DC, with whom were Loretta C. Argrett, Asst. Atty. Gen., Mildred L. Seidman and David Gustafson, for defendant.

## OPINION

MARGOLIS, Judge.

This tax case comes before the court on both plaintiff's motion for partial summary judgment and defendant's cross motion for summary judgment concerning plaintiff's claim for readjustment of partnership items.

Transpac Drilling Venture 1983–2 ("Transpac 83–2"), one of approximately 72 Transpac partnerships, filed timely partnership level returns in 1983 and 1984. Transpac 83–2 was a Delaware limited partnership comprised of two general partners and approximately 35 limited partners. Transpac 83–2 reported substantial losses for both years. Subsequent to the filing of its partnership returns, one of Transpac 83–2's general partners pled guilty to conspiracy to commit tax fraud. Other individuals, who were the undisclosed promoters and managers of the Transpac partnerships, were convicted of tax fraud, conspiracy, and racketeering in connection with the Transpac partnerships.

The Internal Revenue Service ("IRS") disallowed all of the deductions claimed by Transpac 83–2 in 1983 and 1984. Plaintiff claims that the statute of limitations covering the assessment of deficiencies for the 1983 and 1984 partnership returns expired. The defendant claims that the statute of limitations has not expired, the plaintiff's claim is forfeited because of fraud, and the administrative adjustments disallowing all of the deductions were proper.

## FACTS

A. The Background of the Tax Dispute

Transpac 83–2, a limited partnership, filed its Form 1065, Partnership Return of Income, with the IRS for the taxable year 1983 on March 18, 1984. On April 22, 1985, Transpac 83–2 filed its Form 1065 with the IRS for the taxable year 1984. Transpac 83–2's 1983 and 1984 partnership returns stated that it had two general partners, Douglas C. Adams and Churchill Oil and Gas Corporation ("Churchill Oil"), whose profit interests were .10005% and .9000% respectively. Adams signed both the 1983 and the 1984 partnership returns. On the 1983 and the 1984 partnership returns, Transpac 83–2 used the cash receipts and disbursements method of accounting.

On its 1983 partnership return, Transpac 83–2 claimed the following deductions: $720,870 of intangible drilling costs; $62,500 of management fees; $40,000 of legal and accounting fees; and a minimum annual royalty fee of $588,333. It reported no gross income and claimed an ordinary loss of $1,411,703. For 1984, the partnership reported gross income of $2,137 and claimed as an expense a minimum annual royalty fee of $588,333. Thus, it reported an ordinary loss of $586,196.

On November 9, 1989 the IRS mailed notices of final partnership administrative adjustment ("FPAA") for both tax years 1983 and 1984 to Adams, and on November 28, 1989, copies of the FPAAs were mailed to the other notice partners in the partnership. The 1983 FPAA disallowed all four of the deductions, totaling $1,411,703, taken by Transpac 83–2 in the 1983 taxable year. Similarly, the 1984 FPAA disallowed the $588,333 minimum annual royalty expense.

B. The Commencement of Criminal Proceedings Relating to the Transpac Drilling Ventures

Transpac 83–2 was one of approximately 51 Transpac Drilling Venture ("TDV") partnerships formed during 1983. Typically, each 1983 partnership offered 35 limited partnership shares or units that were sold for approximately $75,551 each. The limited partners paid 20% of the purchase price over 24 months, with the remainder financed through an entity entitled Andover Finance, Ltd. ("Andover"). The Andover financing was to be repaid through production income. The parties do not dispute that the business purpose, financing, rights, benefits and obligations of the 1983 Transpac partnerships were essentially identical.

The IRS undertook an examination of some of the TDV partnerships. During the course of the examination, the IRS uncovered information suggesting that federal crimes had been committed by the promoters of the TDV partnerships, and the matter was referred to the IRS's Criminal Investigation Division, which accepted the fraud referral in December of 1985.

On September 15, 1987, John Peter Galanis and seven other defendants were indicted in the Southern District of New York for numerous crimes related to the Transpac Partnerships. *See United States v. John Peter Galanis*, No. S 87 Cr. 520 (CLB) (S.D.N.Y. Sept. 15, 1987). The indictment charged that Galanis was the undisclosed principal of the TDV partnerships and that Galanis controlled· an organization, referred to as the Galanis organization, that was comprised of a network of associated individuals, corporations and partnerships, including Andover. The indictment stated that the Galanis organization engaged in the syndication of the Transpac Drilling Ventures and the financing of investments in the Ventures. Count one of the indictment specifically charged the defendants with conspiracy to violate 26 U.S.C. § 7206(2), which is a prohibition against aiding and presenting false or fraudulent tax returns. The indictment further charged that the conspiracy planned to and succeeded in passing on to the limited partners of the Transpac partnerships over $172 million of false tax deductions.

In describing the conspiracy, the indictment stated that the TDV limited partnerships were marketed as lucrative tax shelters. The tax benefits were supposed to accrue from pre-paid drilling expenses, minimum annual royalties, and other cash expenditures. The conspiracy allegedly created the appearance of genuine business transactions to support the false deductions. The fake deductions were reported on the partnership tax returns, Forms 1065, and filed with the IRS. This action resulted in the conspirators issuing inaccurate Schedules K–1 to limited partners for use in their individual tax returns.

The indictment further alleged that the conspirators caused the distribution of fraudulent offering materials to potential investors in the TDV partnerships. These materials falsely represented that the Transpac general partners would have exclusive control over their partnerships; falsely stated that the Transpac partnerships were intended to provide substantial future income and economic benefits to investors; and omitted any reference to the fact that Galanis, who had been convicted or charged with numerous offenses in the past, controlled the TDV partnerships.

The indictment also charged Galanis and five co-defendants with 20 separate counts of violating 26 U.S.C. § 7206(2) based upon deductions claimed by the TDV partnerships. Count 18 of this allegation included the filing of Transpac 83–2's partnership return for its 1984 taxable year.

In addition to charging the defendants with tax fraud conspiracy and aiding and presenting false or fraudulent tax returns, which included count 18, the indictment also charged Galanis and his co-defendants with racketeering, which encompassed a scheme to defraud the IRS. On July 5, 1988, a jury found Galanis guilty of tax fraud conspiracy, and racketeering, including the charge of a scheme to defraud the IRS. The jury also found Galanis guilty of multiple violations of 26 U.S.C. § 7206(2), including count 18, which encompassed the "other deductions" claimed on Transpac 1983–2's partnership return for the taxable year 1984.

Douglas Adams played a part in Galanis' conviction. In approximately May of 1987, Adams contacted federal officials working on the criminal investigation of the Transpac partnerships. At that time, Adams surrendered to the Assistant United States Attorney handling the criminal investigation. The government filed a two count information that charged Adams with conspiracy to violate 26 U.S.C. § 7206(2) and specified securities violations. The information stated that one of the goals of the conspiracy was to "create false tax deductions based on fictitious business expenditures, to be passed on to the limited partners of the Transpac Drilling Ventures." *United States of America v. Douglas C. Adams*, No. 87 Cr. 695 (CLB), at 3 (S.D.N.Y.). The means of the conspiracy, as described in Adams' information, was essentially identical to the means described in the conspiracy count of the indictment against Galanis and his co-defendants.

On September 4, 1987, Assistant United States Attorney Vincent Briccetti wrote a letter to Gary Naftalis, who along with Alan Friedman was Adams' counsel. The letter summarized an agreement between Adams and the United States. Adams agreed to plead guilty to the conspiracy and securities charges. In return, Adams would not be prosecuted further for his involvement in the Transpac Ventures, Churchill Oil or any other disclosed activities arising from Adams' relationship with Galanis. In addition, the agreement specified that Adams was to fully and truthfully respond to questions from the Securities and Exchange Commission ("SEC") and the United States Attorney's Office. Adams was also required to "cooperate fully with [various specified federal agencies] and the Internal Revenue Service...." Letter from Vincent Briccetti, Assistant United States Attorney, to Gary Naftalis, Esq. at 2 (September 4, 1987). Adams also pledged to testify on behalf of the government as needed, supply documents to the SEC or the United States Attorney's office if necessary, and file amended personal income tax returns.

On September 9, 1987, Adams pled guilty to count one of the information. At the hearing on Adams' plea, the Assistant United States Attorney represented to the court that the government had sufficient evidence to present a *prima facie* case against Adams. In response to a question from the court, Adams' attorney, Friedman, represented that he neither knew of any valid legal defenses available to Adams nor of any reason why Adams should not be permitted to plead guilty. The court, by the parties' request, deferred sentencing to permit the evaluation of Adams' pending cooperation.

Regarding the plea agreement, the court noted that Adams

> is entitled to have the full extent of his cooperation known.... [C]ooperation entails telling the truth and only telling the truth and do not get in any kind of position where your recollection is distorted by a desire to be more cooperative than the actual facts allow you to be.
>
> All they are entitled to and all they really want from you is the truth, what you know and what you remember.
>
> So it is important to cooperate. But it is not right to be more helpful than the truth allows.

*Adams, supra,* at 14–15.

Adams proceeded to render assistance to the United States in the Transpac matters. On January 23, 1988, he sought reimbursement from the government for travel expenses incurred in testifying before the grand jury. On May 17 and 18, 1988, Adams testified at the *Galanis* trial.

C. The *Galanis* Trial and Adams' Cooperation

At the trial of Galanis and his co-defendants, Adams described his role in the Transpac Ventures. Despite holding himself out as a general partner in approximately fifteen TDV partnerships, Adams stated that "[t]he only activity that I had with Transpac was basically as a salesman." Transcript at 4780, *Galanis,* No. S 87 Cr. 520. According to Adams, Churchill Oil, which was a general partner in many of the TDV partnerships along with Adams, was formed by Adams and Tom Basmajian "specifically to work with John Landon and John Galanis in Transpac Drilling Ventures." *Id.* at 4779–80. Adams' sales efforts were supervised by Sam

Rosengarten, who Adams met during a trip with Galanis in Puerto Rico. Adams also testified that, during his sales work, he was aware that the Transpac Ventures' offering materials falsely represented that the general partners had complete control over the finances and operations of the partnerships. Furthermore, Adams knew that the materials failed to disclose the involvement of Galanis. They also falsely represented that certain entities under the control of the Galanis organization, such as Andover, Transpac Drilling, and Churchill Oil, were separate and independent. Adams stated that neither he nor Churchill Oil ever performed any management services, negotiated contracts, kept books, saw any wells drilled or made a personal investment in any of the partnerships in which they were general partners. Adams also testified concerning other questionable tasks that he performed for the Galanis organization.

Adams testified that in December of 1983 he became aware that the partnerships did not have the money in escrow that they were supposed to possess. According to Adams' testimony, Galanis and others explained to Adams that Andover had only a set amount of money and that this money would be used repeatedly to close the partnerships.

The testimony of IRS Agent John Dennehy, who was called by the government as an expert, corroborated Adams' testimony regarding the recycling of financial resources within the Transpac syndication. Dennehy described the concept of "check-swapping" as the exchange of checks between parties, usually simultaneously, that has no economic substance and is used to create the appearance of payment to provide a tax deduction. Dennehy testified that entities in the Galanis organization employed check-swapping and a check circle scheme in order to generate the appearance of millions of dollars of expenditures to be used by the 1982 and 1983 Transpac partnerships for tax purposes.

On November 1, 1988, Adams was placed on probation for three years and his sentence was suspended. This sentence was based, in part, on his early cooperation with the government.

**D. Adams' Role in the Filing of the 1983 and 1984 Transpac Partnership Tax Returns**

At the *Galanis* trial, Adams discussed his role in signing partnership tax returns on behalf of Transpac partnerships. Those returns were prepared by accountants in the offices of Andover, which the Galanis organization controlled. On direct examination Adams was asked:

Q. What were you aware of personally that was not accurate about those tax returns?

A. The management fee that I was to receive and listed on those returns, I never did receive.

Q. When you say you, you as a salesman or you as what?

A. Both as a general partner personally as Douglas C. Adams or Churchill Oil and [Gas] never did receive those management fees.

Q. Is it fair to say the exhibit you have in front of you there refers to the management fee as being paid to the GP for his or its management services?

A. Yes.

Q. What about the other expenses claimed on the partnership tax returns, do you know whether those were accurate or not?

A. I have no idea. As I said before, I had no control over the operation of the partnership or the finances of the partnership.

*Id.* at 4788–89.

On May 14, 1989, Adams discussed his involvement with the fraudulent returns and the Galanis organization in a speech given to the American Association of Accountants. As an example of his ethical compromises, Adams stated that "a corporation I owned was the general partner of numerous oil and gas drilling ventures, but Galanis controlled all of the finances and I was nothing but a 'front man'." Douglas C. Adams, Speech for the American Association of Accountants (May 14, 1989). Concerning the 1983 partnership tax return, Adams stated that

I magnified [my] downward spiral, in February of 1984, when I signed fifteen 1983 Transpac partnership tax returns that

claimed all of the inflated deductions. This felonious act was easier to stomach after making the wrong decisions just two months earlier.

*Id.*

E. Extensions to the Periods of Limitations for Assessment

Churchill Oil had only two directors: Adams and Thomas Basmajian. On March 2, 1983, Churchill Oil forfeited its right to do business under Texas law. The charter of Churchill Oil was forfeited on February 20, 1984. By sworn affidavit, an IRS attorney declared that the IRS never received notification of this forfeiture, with respect to the 1983 and 1984 partnership tax returns, prior to 1989.

On April 2, 1986, Adams signed, as President of Churchill Oil, and filed with the IRS a Power of Attorney and Declaration of Representative, Form 2848, for Transpac 1983–2. The Form 2848 granted Naftalis and Friedman power of attorney on behalf of the partnership in connection with the partnership's tax returns for the taxable years, 1982–85.

On January 7, 1987, Friedman executed an IRS Form 872–O, also known as a Special Consent to Extend the Time to Assess Tax Attributable to Items of a Partnership, on behalf of Transpac 1983–2 for the taxable year 1983.

Adams executed a separate Form 872–O on behalf of Transpac 1983–2 for the 1983 taxable year on March 2, 1987. This Form 872–O was signed by Adams as President of Churchill Oil.

On January 23, 1988, Adams executed another Form 872–O on behalf of Transpac 1983–2 that covered the 1984 taxable year. Adams signed this form in his own capacity. All three Form 872–Os were executed on behalf of the IRS by Edward J. Vasconcellos, a Group Manager, shortly after their receipt.

Vasconcellos oversaw the examination of the 1982 and 1983 Transpac partnerships, including Transpac 1983–2. Vasconcellos personally took responsibility for soliciting the Form 872–O consents. By sworn affidavit submitted to this court, Vasconcellos recalls that he did not specify which partner should sign the form, but requested generally that the form should be signed by the tax matters partner ("TMP"). In partnerships where a power of attorney had been submitted, he mailed the form to the appointed representative. In addition, he also mailed a second Form 872–O to the partnership and requested that the TMP sign it. Vasconcellos claims that he was unaware of any facts suggesting that any partner in Transpac 1983–2 was ineligible to serve as a TMP. He also claims that the IRS did not receive notice that any partner of Transpac 1983–2 was ineligible to serve as a TMP and that its administrative files, concerning the Transpac examination, contained no such information.

According to Vasconcellos, at no time prior to the end of 1989 did the IRS receive a valid TMP designation from Transpac 83–2. Vasconcellos claims that the IRS relied on the Form 872–Os by delaying the sending of FPAAs until after the expiration of the normal three-year limitations period. In the nine instances where Transpac partnerships did not return a Form 872–O, Vasconcellos directed that FPAAs be sent to the TMPs of those partnerships prior to the running of the three-year limitations period. He further claims that he would have timely mailed FPAAs to Transpac 1983–2 if he had not received the Form 872–Os covering the 1983 and 1984 taxable years.

F. The Ackerman Report

Jack Ackerman, an IRS employee, prepared an Engineering and Valuation Report that analyzed the Transpac Drilling Ventures for use in the *Galanis* trial. The report examined TDV 1983–16, which Ackerman stated was representative of the 1983 TDV partnerships. According to the private placement memorandum issued by one of the partnerships, the Transpac Drilling Program called for drilling between two to six oil or gas wells. In the case of TDV 1983–16, nine drilling prospects were considered. The report concluded, based on information gathered by an audit, that only two of these sites were active after TDV 1983–16's formation. After analyzing the production of these wells, Ackerman concluded that TDV 1983–16's gross income for 1984 and 1985 was $18,293 and $37,407 respectively.

According to his analysis, Ackerman calculated the present value of net revenues to a typical Transpac partnership to be $633,705, which Ackerman considered to be a liberal calculation. This amount did not cover the up-front costs of the partnership. Ackerman concluded that at best TDV 1983–16 could not support more than 35% of the drilling costs. Ackerman was able to positively identify a total of 118 Transpac well sites. He was able to identify drilling at 35 of these sites and production at 27 sites.

## DISCUSSION

Under the court's summary judgment rule, material facts that have been "claimed and adequately supported" are deemed established unless such material facts are "included in the Statement of Genuine Issues and are controverted by affidavit or other written or oral evidence." RCFC 56(d)(3). Summary judgment should be granted when appropriate in order to preserve judicial and litigant resources. *Barmag Barmer Maschinenfabrik AG v. Murata Mach. Ltd.*, 731 F.2d 831, 835 (Fed.Cir.1984). If the movant supports its motion as provided by the Rule, "an adverse party may not rest upon mere allegations or denials ... such party's response, by affidavit or as otherwise provided by this rule, must set forth specific facts showing that there is a genuine issue for trial." RCFC 56(f); *see also Barmag*, 731 F.2d at 835–36.

A. The Periods of Limitations for Assessment

■ Plaintiff contends that the periods for assessment of deficiencies attributable to partnership items on Transpac 1983–2's 1983 and 1984 partnership returns have expired and have not been validly extended. As a matter of background, a partnership must file a partnership level return for informational purposes under the Internal Revenue Code ("IRC"). 26 U.S.C. § 6031. Notwithstanding this partnership return, the individual partners remain "liable for income tax only in their separate and individual capacities." IRC § 701. Under the IRC, the tax treatment of any partnership item is determined at the partnership level pursuant to the procedures created by the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"). IRC §§ 6221–33. Under the TEFRA machinery, the partnership is commonly represented by the tax matters partner, who is, unless impracticable, either (1) a general partner designated pursuant to the regulations or (2) the general partner having the largest profits interest at the end of the taxable year. IRC § 6231(a)(7).

The IRS must give the partners notice before commencing an administrative proceeding evaluating any partnership item and a FPAA resulting from the proceeding. IRC § 6223. A tax attributable to any partnership item must be assessed against any person within three years of the later of either the date the partnership return was filed or the last day for filing such a return. IRC § 6229(a). This period is suspended for a specific time if a FPAA is mailed to the tax matters partner. IRC § 6229(d).

The period of limitations for a specific partner may be extended by an agreement between the IRS and the partner. IRC § 6229(b)(1)(A). The period of limitations with respect to all partners may be extended by an agreement between the IRS and the tax matters partner or any other person who possesses written authorization from the partnership to make such an agreement. IRC § 6229(b)(1)(B). The period of limitations extends to six years for all partners if "any partner has, with the intent to evade tax, signed or participated directly or indirectly in the preparation of a partnership return which includes a false or fraudulent item...." IRC § 6229(c)(1)(B).

In contending that the three-year period of limitations was not properly extended before the FPAAs were mailed for the 1983 and 1984 taxable years, plaintiff reasons, first, that the 1986 appointment of Alan Friedman as a partnership representative was ineffective because Churchill Oil was dissolved at the time Adams signed the Form 2848 as president of Churchill Oil. Thus, Friedman could not extend the assessment period for all partners. Second, plaintiff argues that the Form 872–O, agreeing to extend the statute of limitations for the 1983 taxable year, signed by Adams for Churchill Oil was ineffective because Churchill was dissolved when

the agreement was signed on March 2, 1987. Third, plaintiff contends that the Form 872–O covering the 1984 taxable year was ineffective because Adams was acting as an agent of the government when he signed the agreement on January 23, 1988.

The tax court has addressed the effectiveness of the Form 872–Os executed by Adams, on behalf of Transpac partnerships that had both Adams and Churchill Oil as general partners. *See Transpac Drilling Venture 1982–16*, 67 T.C.M. 1995, 1994 WL 17148 (CCH 1994). The legal principles applied in that case are sound and well-reasoned, and the court perceives no reason to create a different body of precedent in this forum.

■ Here, neither the 1983 nor 1984 partnership returns designated a tax matters partner as contemplated by the tax regulations, 26 C.F.R. § 301.6231(a)(7)–1T. IRC § 6231(a)(7)(A). Thus, as the general partner with the largest profit interest, Churchill Oil served as the TMP of Transpac 1983–2 until it lost its corporate charter on February 20, 1984. IRC § 6231(a)(7). When Churchill forfeited its corporate charter, it lost its power to be a partner in Transpac 1983–2. *Transpac 1982–16*, 67 T.C.M. at 1999. As the sole remaining general partner of Transpac 1983–2, Adams became the TMP pursuant to section 6231(a)(7)(B). *Transpac 1982–16*, 67 T.C.M. at 1999. As the TMP, Adams possessed the authority on March 2, 1987 to extend the period of limitations for the taxable year 1983 for all partners. *See* IRC § 6229(b)(1)(B).

Accepting plaintiff's view that the 1983 tax year extension agreement is infirm because Adams signed on behalf of Churchill Oil, rather than in his personal capacity, would construct a technical obstacle in the TEFRA process that is not required by the statute or regulations and is contrary to TEFRA's purpose of simplifying partnership taxation. *See Transpac Drilling Venture 1983–63 v. United States*, 16 F.3d 383, 387 (Fed.Cir.1994). *See generally*, H.R.Rep. No. 97–760, 97th Cong., 2d Sess. 599–610 (1982), U.S.Code Cong. & Admin.News 1982, p. 781, 1371–1382. As in *Transpac 1982–16*, Adams' execution of the 1983 extension agreement was valid because he was the tax matters partner

and he intended to extend the limitations period by signing the Form 872–O. 67 T.C.M. at 1999.

Similarly, Adams' appointment of Friedman as a partnership tax representative is not invalid merely because Adams signed the Form 2848 for Churchill Oil rather than in his personal capacity. The fact that Adams granted a power of attorney to Naftalis and Friedman regarding Transpac's 1982–85 partnership returns does not divest Adams of his statutorily conferred power as the tax matters partner to extend the limitations period. However, because Adams retained this power, it is unnecessary to evaluate whether or not the extension agreement entered into by Friedman for the 1983 tax year is effective.

■ Plaintiff's contention that Adams could not agree to a 1984 tax year limitations extension for the entire partnership in January 23, 1988, because he was an agent of the government is more difficult. At that time, Adams had entered into a cooperation agreement with the United States that included providing information to the IRS. In addition, his sentencing had been deferred, and it was clear that his cooperation would effect the pending sentence. Nevertheless, in *Transpac 1982–16*, the tax court held that Adams' cooperation with the government did not invalidate the extension agreements executed by Adams because Adams was the actual tax matters partner. 67 T.C.M. at 2000–01. The tax court rejected the plaintiff's attempt to introduce agency principles in determining whether a tax matters partner can validly extend the period of limitations, reasoning that the tax matters partner is a statutory creature created by Congress to simplify partnership level taxation.

For certain, the applicable statutory provisions and regulations do not explicitly provide for agency-based limitations on the TMP's power. Rather, the regulations do contemplate the scenario of a tax matters partner losing his TMP status because of a criminal investigation. *See* 26 C.F.R. §§ 301.6231(a)(7)–1T(*l*)(4); 301.6231(c)–5T; *see also* IRC § 6231(c). By the terms of the regulation, 26 C.F.R. § 301.6231(c)–5t, it is

clear that Adams did not lose his TMP status because the IRS did not provide notice that Adams' partnership items would be treated as nonpartnership items. The regulations' coverage of the loss of TMP status because of a criminal investigation undercuts the contention that a federal common law, agency analysis applies outside of the parameters established by the regulation. Under the facts of this case, the court declines to apply an agency limitation on Adams' ability, as TMP, to extend the assessment period. The precedent cited by plaintiff is not to the contrary.

Even if Adams lost his TMP status due to his cooperation with the government, defendant is entitled to summary judgment on the applicability of the six-year limitations period. The six-year period applies if any partner with the intent to evade tax participates in the preparation of a return that includes a false or fraudulent item. IRC § 6229(c)(1). Although there is a dearth of case law interpreting section 6229(c), the standards provided in this section have been interpreted under different sections of the IRC. Specifically, the government carries the burden of proving the falsehoods or fraud with intent to evade tax by clear and convincing evidence. *See Thalia Kelly Considine v. United States,* 645 F.2d 925, 227 Ct.Cl. 77, 80 n. 8, 85–86 (1981) (analyzing the civil fraud penalty, formerly IRC § 6653(b), which employs an intent to evade tax standard); *Irolla v. United States,* 390 F.2d 951, 182 Ct.Cl. 775, 779 (1968) (using this standard in analyzing the civil fraud penalty).

On the intent to evade tax issue, the government has carried its burden. While intent in tax fraud cases is generally a difficult question of fact involving subjective thoughts, *see Irolla,* 390 F.2d 951, 182 Ct.Cl. at 778–79, the government has proffered the testimony of Adams concerning his intent. For purposes of this summary judgment motion, Adams has sworn by affidavit that the statements he gave at the *Galanis* trial, at his own hearing, and in his speech to the American Association of Accountants are true and correct. At the *Galanis* trial, Adams indicated that he knew, when he signed the Form 1065s for the Transpac

partnerships that the claimed management fee deductions had never been paid. This is corroborated by Adams' statements to the American Association of Accountants, in which Adams admitted that he knew the signing of the 1983 tax returns was a felonious act. He was also aware of diversion of money from the escrow fund. This evidence establishes that Adams knowingly signed the false 1983 partnership tax return with an intent to evade tax. Plaintiff has not produced even a scintilla of evidence that challenges Adams' statements that is sufficient to place this material fact into dispute. *See* RCFC 56(d)(2) & (3).

On Transpac's 1984 Form 1065, the partnership claimed a deduction for a minimum annual royalty fee. Adams testified that he had no idea whether the other expenses taken on the partnership return were legitimate. Moreover, despite being a general partner, Adams testified that he had no control over the finances or affairs of the Transpac partnerships. Thus, the question here is whether Adams' willful blindness and the fact that he was no more than a pliant dupe for an undisclosed organization that controlled the partnership forecloses the application of the six-year statute of limitations, which is triggered by the fraud of "any partner." IRC § 6229(c)(1). The court has no difficulty in holding that the intent of Galanis and members of the Galanis organization can be imputed to Adams under IRC § 6229(c)(1). The purpose of the six-year period is to protect the United States from fraud, and precluding its application in this case because Galanis or his organization was not technically a partner defeats that purpose. Given this imputation, the record is replete with evidence that Galanis and members of the Galanis organization committed tax fraud with an intent to evade taxes. For example, Galanis was convicted of Count 18 of the indictment, which charged that he "unlawfully, wilfully, and knowingly" claimed fraudulent "other deductions" on Transpac 1983–2's 1984 tax return. And although a 26 U.S.C. § 7206 conviction does not in and of itself establish an intent to evade tax, as the conviction requires a different level of scienter, the conviction in addition to the other

evidence in the record establishes Galanis' intent to evade tax.

■ Plaintiff, in its reply brief, raises the notion that Transpac 83–2 may not have been a partnership under Delaware law because of the fraud against the limited partners. Plaintiff posits, amongst other things, that this may preclude the application of TEFRA altogether. However, this position is without merit. The Code broadly defines partnership, for the purposes of the TEFRA rules, to include a "syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation or venture is carried on ..." IRC § 761. *See* IRC §§ 6031(a); 6231(a)(1)(A). Assuming that Transpac 1983–2 failed to be a true partnership under state law, it could still be classified as a group carrying on a venture or some similar characterization under the definition. Moreover, the TEFRA partnership provisions apply in any event because Transpac 83–2 filed partnership returns for the years in question. IRC § 6233(a); 26 CFR § 301.6233–1T(a). In addition, plaintiff alleged in its complaint that it was a partnership. Plaintiff cannot now, in its reply brief, disavow the facts stated in its pleading. *See E.C. McAfee A/C Bristol Metal Indus. v. United States,* 832 F.2d 152, 154 n. * (Fed.Cir.1987).

B. The Adjustments to the Partnership Items

Defendant argues that the partnership items reported in 1983 and 1984 are not deductible because they are based on sham transactions, no actual payments were made for the items, the payments were not made for a deductible purpose and the deductibility of the expenses are limited because Transpac 83–2 was not an activity engaged in for profit.

■ Under the sham transaction doctrine, a transaction is disregarded for tax purposes if (1) there is no business motive for the transaction aside from the tax benefits and (2) the transaction has no economic substance, which is an objective inquiry into whether a reasonable possibility of profitability existed apart from tax benefits. *Rice's Toyota World Inc. v. Commissioner,* 752

F.2d 89, 91 (4th Cir.1985); *see Frank Lyon Co. v. United States,* 435 U.S. 561, 573, 98 S.Ct. 1291, 1298, 55 L.Ed.2d 550 (1978); *Lerman v. Commissioner,* 939 F.2d 44, 52–53 (3d Cir.), *cert. denied,* 502 U.S. 984, 112 S.Ct. 590, 116 L.Ed.2d 615 (1991); *Johnson v. United States,* 11 Cl.Ct. 17, 25 (1986); *Hawley v. Commissioner,* 55 T.C.M. 217, 223, 1988 WL 12766 (CCH 1988). In regards to a transaction executed by a partnership, the business motives and the reasonable possibility of profit are determined at the partnership level. *See Tallal v. Commissioner,* 778 F.2d 275, 276 (5th Cir.1985); *Hawley,* 55 T.C.M. at 223.

■ Plaintiff has proffered no evidence that the expenses claimed on the 1983 and the 1984 partnership returns were genuine or not based on sham transactions. The court notes that plaintiff has the burden of proving that the administrative adjustment was incorrect. *See Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933). Consistently, plaintiff admitted at oral argument that Transpac 1983–2 as an enterprise was a sham and its activities were not engaged in for profit.

In contrast, the government has presented strong evidence of the infirmities in the deductions claimed on the 1983 and 1984 partnership returns. For example, John Dennehy testified, at the *Galanis* trial, that the deductions claimed by the Transpac partnerships were created by circling checks through Galanis controlled organizations. Dennehy testified that the 1983 TDV partnerships, in connection with expenses claimed as deductions, wrote checks of over $150 million, even though only about $23 million in funds were on deposit in the relevant accounts. Plaintiff has presented no evidence whatsoever to counter Dennehy's testimony and evidence.

Furthermore, Defendant's evidence shows that none of the 48 substantially identical 1983 Transpac partnerships, which includes Transpac 1983–2, filed a tax return after 1984. In addition, Galanis' convictions for tax fraud regarding the 1984 partnership returns, conspiracy, and racketeering regarding the Transpac Ventures also discredit the

legitimacy of Transpac 1983–2. Moreover, Adams testified that the management fee was never paid, he was aware of fraudulent representations to investors, and he was told about the finance scheme. Defendant also points to the detailed testimony and analysis provided by Ackerman at the *Galanis* trial. Ackerman analyzed TDV 1983–16, a representative partnership, and concluded that the actual present worth of the wells drilled by the venture did not even come close to covering the up-front expenses of the partnership. He further concluded that the venture could not support even 35% of its drilling costs.

The facts of this case are analogous to *Hawley*, 55 T.C.M. 217. In *Hawley*, the tax court addressed the deductibility of advanced royalty payments allegedly made by limited partnerships that were a part of a syndication of 296 coal-mining, limited partnerships. *Id.* at 218–19. Their promotional materials alluded to tax write offs of 3.5 to 1. *Id.* at 224. In fact, the partnerships never engaged in coal mining, and the evidence showed that the partnerships' promoter had engaged in an elaborate check circle scheme to generate cancelled checks that, in sum, far exceeded the amount the partnerships had on account. *Id.* at 225–26. The tax court disallowed the deduction, holding that the partnerships' activities and the alleged advanced royalty payments were devoid of economic substance.

Similar to *Hawley*, the evidence presented here establishes that the activities of Transpac 1983–2 were shams. The partnership's activities served as a front for a criminal enterprise, and as a whole the partnership was not organized or managed for the purpose of generating a profit. It had no reasonable possibility of turning even a modicum of profit. There is no evidence that any of the claimed expenses had economic substance. In addition, the enterprise, when engaging in the transactions, lacked a *bona fide* profit objective as is required by IRC § 162, *see Surloff v. Commissioner,* 81 T.C. 210, 1983 WL 14861 (1983).

Although conceding that Transpac 1983–2 was a sham when viewed through the eyes of the general partners who were under the control of the Galanis organization, plaintiff asserted at oral argument that the normal rule of looking at the substance of the transaction at the partnership level does not apply because there was no partnership. In other words, plaintiff argues that no organic partnership existed because of the sham nature of Transpac 1983–2's business at the partnership level and the fraud committed by its general partners and undisclosed promoters. In the absence of an underlying partnership, plaintiff believes that the objectives and intent of the limited partners control. The court, however, rejects this argument. The tax court did not employ such an analysis in *Hawley,* which involved a similar scheme. *See* 55 T.C.M. at 223. Leaving the focus at the managerial tier of the enterprise creates a greater likelihood of taxing the enterprise as it actually operates. In addition, the accepted approach promotes administrative efficiency.

In light of the whole record, defendant is entitled to summary judgment on its adjustment to the 1983 and 1984 partnership returns. Given this decision, it is unnecessary to reach the question of whether the fraud of Galanis and Adams can be imputed to the limited partners pursuant to the forfeiture statute, 28 U.S.C. § 2514.

### CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied, and defendant's motion for summary judgment is granted. Specifically, the readjustment to the partnership items, sought by plaintiff, is denied because the periods for assessment have not expired and the expenses claimed by Transpac 1983–2 on its 1983 and 1984 partnership returns were non-deductible because they were based on sham transactions.