62 F.3d 1433
 38 U.S.P.Q.2d 1031
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
Robert N. BLUMENTHAL and Andreas T. MELVILLE, Plaintiffs-Appellants,
v.
BARBER-COLMAN HOLDINGS CORP. and Barber-Colman Company and
Surface Combustion, INC., Defendants/Cross-Appellants.
 Nos. 93-1005, 93-1006.
 United States Court of Appeals, Federal Circuit.
 July 31, 1995.
Rehearing Denied; Suggestion for Rehearing In Banc Declined
Oct. 5, 1995.*
 
 Before NEWMAN, MICHEL, and SCHALL, Circuit Judges.
 Opinion for the court filed by Circuit Judge SCHALL. Dissenting opinion filed by Circuit Judge NEWMAN.
 DECISION
 SCHALL, Circuit Judge.
 
 
 1
 Robert N. Blumenthal and Andreas T. Melville ("Blumenthal") appeal from the decision of the United States District Court for the Northern District of Illinois in docket number 90 C 20365 (N.D. Ill. Aug. 7, 1992). The district court granted summary judgment of non-infringement of Blumenthal's Patent No. 4,588,493 ("the '493 patent") by Barber-Colman Holdings Corp., Barber-Colman Co., and Surface Combustion, Inc. ("Barber-Colman"). Barber-Colman cross appeals the district court's refusal to award sanctions and attorney fees. We affirm.
 
 DISCUSSION
 A.
 
 2
 A trial court may grant summary judgment where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). We review de novo whether the standards for summary judgment have been met. Mingus, 812 F.2d at 1390.
 
 
 3
 In determining whether summary judgment should be granted on the question of infringement, the trial court must first construe the claims, deciding the meaning and scope of any disputed terms in the claims as a matter of law. Markman v. Westview Instruments, Inc., 52 F.3d 967, 34 USPQ2d 1321 (Fed. Cir. 1995) (in banc). We review de novo the district court's construction of the claims. Id. The claims as construed by the court are then applied to the accused device. If there remain any disputed factual issues concerning whether the claims as construed are infringed by the accused device, literally or in accordance with the doctrine of equivalents, summary judgment is not appropriate unless the movant must prevail even on the non-movant's version of the facts. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).
 
 B.
 
 4
 The '493 patent, entitled "Hot Gas Measuring Probe," describes and claims an improved oxygen sensing probe. Blumenthal sued Barber-Colman for infringement of claim 9 of the '493 patent. It was undisputed that the accused Barber-Colman devices met every limitation in claim 9 except the one in clause b. It also was undisputed that the limitation in clause b was not met literally in the accused devices. Thus, the sole issue before the district court was whether the accused devices met the limitation of clause b of claim 9 under the doctrine of equivalents.
 
 
 5
 Clause b of claim 9 recites that: "the second electrode defines a frusto-conical interior surface terminating in a grooved flat adapted to guide the electrolyte and a central opening in said electrode flat." Col. 10, lines 41-44. In construing clause b, the district court stated:
 
 
 6
 [C]laim 9 ... [requires] an electrode with a tapered surface to guide an electrolyte. Neither the frusto-conical nor the guiding limitations of claim 9 can be read as meaningless. The claim specifically calls for a "frusto-conical interior surface terminating in a grooved flat adapted to guide the electrolyte." The specification in the patent also supports this court's construction of claim 9. The specification refers to an electrolyte which is guided by a taper.... Each reference to the frusto-conical aspect of the probe in the specification pertains to the structure of the probe and not the operation of the probe.
 
 
 7
 In short, the district court agreed with Barber-Colman that the term "adapted to guide the electrolyte" means that the tapered shape of the second electrode guides or positions the electrolyte as it is inserted into the electrode during the assembly of the probe.
 
 
 8
 Blumenthal argues that the specification's description of the "guide the electrolyte" function of the second electrode is directed solely to the second electrode's adaptation to guide the electrolyte in order to obtain ventilation of the zone of contact by the furnace gases during use. Thus, Blumenthal contends, the guiding function of the second electrode (with its tapered sides) refers to "maintain[ing] the contact between the electrolyte and the electrode in the ventilation path during operation of the probe."
 
 
 9
 We hold that the district court properly construed clause b. The specification compels the conclusion that clause b is directed toward assembly of the probe, rather than its operation. Referring to an embodiment of the invention reflected in claim 9, the "Summary of the Invention" section of the specification states that the second electrode has "projecting converging walls which guide the flat end of a tubular electrolyte to positively position the electrolyte over a central aperture in a flat portion." Col. 4, lines 36-38. Referring to the same embodiment, the "Description of the Invention" section states that "[t]he outer diameter of the electrolyte tube ... is slightly less than the diameter of the grooved flat surface ... so as to be centrally guided by the tapered surface." Col. 7, lines 51-53. Referring to another embodiment, the description states that "the flat end of the electrolyte tube ... is guided into position against the flat area ... by the taper in the anode converging walls." Col. 8, lines 34-37. This sentence indicates that the function of the tapered walls of the second electrode is to facilitate the act of putting the electrolyte tube into contact with the second electrode ("guided into position against the flat area"). We do not read these statements as referring to facilitating the act of holding the electrolyte tube in place during operation of the probe, as Blumenthal does.
 
 
 10
 Figures 3 and 4a on sheet 1 of the patent drawings -- which is attached -- weigh heavily against the construction of the term "guide the electrolyte" urged by Blumenthal. Each of the figures shows a gap between the tapered wall of the second electrode (21) and the electrolyte (28). The existence of the gap, as shown in the drawings, indicates that the tapered walls could not play a role in maintaining electrolyte contact during probe operation. The drawings do reveal, though, how the tapered walls could serve the purpose of guiding the electrolyte tube "into position against the flat area" during assembly of the probe. Col. 8, lines 35-36.
 
 
 11
 Further, the specification does not support Blumenthal's suggestion that the need to obtain ventilation of the zone of contact by furnace gases during operation of the probe is served by the tapered side walls of the second electrode. Rather, the specification refers generally to gas being exchanged "through the openings in the electrode plate." Col. 4, lines 21-22. In addition, with reference to figures 3, 3a, and 4a, the specification states that "gas can flow or is exchanged, for example, through or from opening 27 and holes 41, along the grooves 39 and electrolyte end 33, through the annular space between the cylindrical surface 25 and outer surface of electrolyte tube 28." Col. 8, lines 3-8.
 
 
 12
 Finally, in connection with its response to Barber-Colman's motion for summary judgment, Blumenthal stated "Agreed" with respect to the following statement by Barber-Colman in support of the motion: "In the patented probe, a tapered guideway engages the end of the electrolyte and, if that end is off center, guides or translates it toward the center of the sheath as the electrolyte tube is inserted into the sheath to its seated position." This is precisely the kind of guiding function that the district court concluded the tapered walls of the second electrode would provide.
 
 
 13
 For the foregoing reasons, we conclude that the district court properly construed clause b of claim 9 as relating to assembly, rather than operation, of the probe. The question then becomes whether, in light of that construction, Blumenthal established the existence of a genuine issue of material fact so as to defeat Barber-Colman's motion for summary judgment. We hold that it did not.
 
 C.
 
 14
 The district court granted Barber-Colman's motion for summary judgment because it found the declaration of Andreas T. Melville -- the only evidentiary item offered by Blumenthal in response to the motion -- to be "conclusory" as to the frusto-conical and guiding limitations of the claim. The court determined that the declaration did not contain facts "showing that the accused probes have a taper which guides the electrolyte" and that it failed to state "how the accused probes have a guiding function." The court concluded: "By not stating that the accused probes contain a taper which guides the electrolyte, plaintiffs have failed to show how the specific limitations described in claim 9, as properly construed, can be found on the accused probes."
 
 
 15
 Through the declarations of Joseph A. Lincoln and Stella R. Bielefeldt, both submitted in support of its motion for summary judgment, Barber-Colman came forward with evidence tending to show that the structure of the accused probes is tubular and does not contain a tapered surface and that, accordingly, the accused probes do not infringe claim 9. Referring to the Barber-Colman devices, the Bielefeldt declaration states: "The electrolyte assembly is a long thin tube which must be inserted into the sheath. The sheath is a hollow tube of about the same length and larger diameter, closed at one end by an end cap. The end cap has a central socket into which the end of the electrolyte assembly must be inserted." According to Ms. Bielefeldt, "there is no guideway in Barber-Colman's probes which will properly seat the end of the electrolyte assembly in the central socket." The Lincoln affidavit states: "There is no structure in [either of the two accused probes] which will guide the electrolyte pellet to the center of the sheath .... There is no taper in the walls of the sheath which would direct the electrolyte pellet into the central socket."
 
 
 16
 Faced with this showing, it was incumbent upon Blumenthal to establish the existence of a genuine issue of material fact with respect to whether the "guide the electrolyte" limitation of clause b is found in the accused probes. To do this, Blumenthal had to "point to an evidentiary conflict in the record; mere denials or conclusory statements [would be] insufficient." SRI Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 1116, 227 USPQ 577, 582 (Fed. Cir. 1985) (citing Barmag Barmer Maschinenfabrik AG v. Murata Mach. Ltd., 731 F.2d 831, 836, 221 USPQ 561, 564 (Fed. Cir. 1984)). Blumenthal, by submitting only the Melville declaration, failed to carry that burden.
 
 
 17
 Significantly, the Melville declaration does not address the statements in the Bielefeldt declaration and the Lincoln affidavit quoted above concerning the structure and assembly of the Barber-Colman probes. Rather, the Melville declaration states that the function of the "frusto-conical interior surface" referenced in clause b of claim 9 is "to keep the electrolyte in contact with the electrode to maintain electrical contact so that the probe continues to function satisfactorily during operation." The Melville declaration further states that this same function is performed in the same way to achieve the same result in the Barber-Colman probes by the surfaces marked "C" in deposition exhibit 110. For the reasons stated above, we conclude that Mr. Melville incorrectly construes clause b when he says that the function of the tapered side walls of the second electrode in claim 9 is to hold the electrolyte in place during probe operation. He also incorrectly equates those tapered side walls with "surfaces C" of the accused probes.
 
 
 18
 What Mr. Melville references as "surfaces C" in the accused probes are the inner walls of the "central socket" of the "end cap" described in the Bielefeldt declaration. Those "surfaces C" are not the side walls of the cylindrical sheath into which the electrolyte assembly in the accused probes is inserted. It is the side walls of the cylindrical sheath of the accused probes, however -- not the inner walls of the central socket -- that correspond to the "frusto-conical interior surface" described in clause b. Moreover, the function of the inner walls of the central socket is not to guide the electrolyte during placement, which is the function of the tapered side walls of the second electrode in claim 9. Rather, the inner walls of the central socket in the accused probes hold the electrolyte assembly in place during operation. Ms. Bielefeldt states: "I hold the electrolyte assembly at one end and feed it into the open end of the sheath. The free end of the electrolyte must then be seated in the socket. The arrangement is not self-seating so I need tweezers to grasp the end of the electrolyte assembly and to manually position it in the central socket." The Bielefeldt declaration and the Lincoln affidavit indicate that Barber-Colman's probes do not contain tapered side walls that guide the electrolyte into place during assembly, and that the electrolyte in the Barber-Colman probes must be seated in the central socket with tweezers. In sum, the Melville declaration (i) fails to counter Barber-Colman's evidence with respect to the structure and assembly of the accused probes, (ii) misconstrues the pertinent limitation of the claim at issue ("frusto-conical interior surface"), and (iii) then applies that limitation to a non-corresponding structure in the accused probes (the central socket). Thus, the declaration fails to respond to the showing made by Barber-Colman in support of its motion for summary judgment.
 
 
 19
 For the foregoing reasons, Blumenthal has failed to establish the existence of a genuine issue of material fact with respect to whether the accused probes meet the limitation of clause b of claim 9 under the doctrine of equivalents. In order to prevail on its claim of infringement under the doctrine of equivalents, Blumenthal had to prove that the accused probes contain every limitation in claim 9. Corning Glass Works v. Sumitomo Elec. U.S.A., Inc., 868 F.2d 1251, 9 USPQ2d 1962, 1967 (Fed. Cir. 1989). Barber-Colman demonstrated in its motion for summary judgment that Blumenthal could not do that. Accordingly, we affirm the order of the district court granting summary judgment in favor of Barber-Colman. We also affirm the district court's denial of Barber-Colman's motion for sanctions and attorney fees as within its discretion.
 
 
 20
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 21
 PAULINE NEWMAN, Circuit Judge, dissenting.
 
 
 22
 I respectfully dissent, as to both the process of appellate review and the technologic facts found de novo by the panel majority.
 
 
 23
 The majority construes the claims so they do not encompass the accused equivalent of Barber-Colman's oxygen sensor probes. Following Markman v. Westview Instruments, Inc., 52 F.3d 967, 34 USPQ2d 1321 (Fed. Cir. 1995) (en banc), the construction of disputed technical terms in infringement litigation is a proper de novo activity of this appellate court. However, equivalency is still a question of fact. In this case there was sufficient evidence whereby the jury could have found equivalence between the electrodes, whether the electrode surfaces were cylindrical or tapered. The issue should not have been decided on summary judgment, whether by the district court's incorrect reading of the "all elements rule," or by the panel majority's incorrect, indeed extraordinary, reading of the claims to refer not to the claimed structure of the electrode, but to the manufacturing assembly of the electrode.
 
 Infringement
 
 24
 Blumenthal's '493 Patent, entitled "Hot Gas Measuring Probe," describes and claims an improved oxygen sensing probe. The patented probe has a novel structure that is designed to provide ventilation at and around the point of contact between the electrolyte and the outer electrode. The ventilation ensures that the atmosphere in the vicinity of the probe is representative of the atmosphere in the furnace, and also carries off soot and other reaction products that could otherwise be deposited at the electrolyte/electrode contact; such deposits distort the readings that are obtained using the probe. The patented probe provides more accurate readings than were available from prior probes.
 
 
 25
 The specification of the '493 Patent explains that the dual purposes of ventilating the tip of the electrode and maintaining adequate contact with the electrolyte are mutually antagonistic. Electrical contact over a substantial surface area provides a good connection but is difficult to ventilate, whereas a point contact is easy to ventilate but has a high contact resistance and can result in interrupted electrical conductivity in the harsh environment of the furnace. The '493 Patent describes several configurations of electrode that balance improved ventilation against increased contact resistance.
 
 
 26
 The infringement issues in this case begin with construction, as a matter of law, of claim 9 of the '493 Patent, directed to an oxygen sensing probe of specified structure whereby ventilation is achieved of the point of contact of the second electrode and the electrolyte:
 
 
 27
 9. In an oxygen sensor for measuring the properties of a gas inside a furnace having a solid electrolyte means with an interior surface and an exterior surface; a first electrode in contact with the interior surface of the electrolyte; a second electrode having a surface in contact with the exterior surface of the electrolyte; conductor means for conducting a voltage generated between the first and second electrodes in correspondence with gas properties; and sheath means having a generally tubular wall surrounding the electrodes and electrolyte for supporting the electrodes and electrolyte within the furnace, the improvement wherein:
 
 
 28
 a. the electrolyte is in the form of a tube having a flat end on the exterior surface and adapted to contact the second electrode;
 
 
 29
 b. the second electrode defines frusto-conical interior surface terminating in a grooved flat adapted to guide the electrolyte and a central opening in said electrode flat; and
 
 
 30
 c. the second electrode defining a plurality of grooves in the inside face thereof and extending radially from the central opening,
 
 
 31
 so that the gas may be exchanged with the interior of the sheath by flow to, through or from the central opening, through the grooves, and past the electrolyte to the interior of the sheath means thereby ventilating the points of contact between the electrolyte and second electrode.
 
 
 32
 The two disputed terms appear in claim clause b: the "frusto-conical interior surface" of the second electrode, and the phrase "adapted to guide the electrolyte." Barber-Colman conceded, for the purposes of its summary judgment motion, that all other claim terms read on its accused probes.
 
 
 33
 Barber-Colman's second electrode surface was cylindrical instead of frusto-conical. That is, in Barber-Colman's electrode the sides were not tapered. Barber-Colman argues on this appeal that the phrase "adapted to guide the electrolyte" refers to the manufacturing assembly of the probe, and not to guidance during use of the probe. The panel majority has adopted this curious position, although manufacturing assembly has nothing at all to do with the invention that is described in the specification and defined in the claims. There is no mention of manufacturing assembly in the prosecution history or the prior art. In selecting this theory of the technological meaning of the claims, the majority has gone outside of the resources that the court established in Markman for appellate claim interpretation as a matter of law.
 
 
 34
 Although Markman did not hold that the factual issues of equivalency were to be removed from the jury, the parties have been denied trial of the disputed facts of equivalency, this court finding new facts based on a deposition inquiry into an issue that is irrelevant to the claimed invention. Whether the frusto-conical shape of the second electrode facilitates assembly during manufacture has no relation to the structure that guides the electrolyte in order to maintain ventilation at the zone of contact during use: that is the claimed invention. The meaning of a claim term is decided de novo on appeal, in light of the claims, the specification, and the prosecution history. Markman, 52 F.3d at 979, 34 USPQ2d at 1329-30. The claims, the specification, and the prosecution history make no mention of guidance during assembly of the probe. No prior art reference is directed to the assembly of probes. Nothing in the prosecution history even remotely suggests that the invention relates to the manufacturing process.
 
 
 35
 The word "guide" as used in the specification describes the structure that provides ventilation. For example, at Col. 4, lines 35-48 a modified embodiment is described:
 
 
 36
 In a modified embodiment, the anode is disc-shaped with projecting converging walls which guide the flat end of tubular electrolyte to positively position the electrolyte over a central aperture in a flat portion. To provide adequate ventilation, the end of the electrode is fabricated with a central hole passing therethrough and several radial grooves in the inside face of the end wall. Additional holes may also be formed through the grooves. Gas passing through the holes and grooves flows between the corresponding portions of the electrolyte and electrode walls. This anode may be used in conjunction with a sheath of the same material or with a ceramic sheath.
 
 
 37
 This is a description of the structure of the probe and how it works, not its assembly during manufacture. The panel majority states that Blumenthal conceded that the frusto-conical shape facilitates manufacturing assembly. Perhaps it does. However, that is entirely unrelated to the patented invention.
 
 
 38
 The panel majority states that the drawings of the '493 Patent show a gap between the sides of the electrolyte and the inner surface of the electrode, and concludes that since the electrode surface and the electrolyte are not touching each other, the electrode can not guide the electrolyte during use of the probe. However, the majority misreads the claim, which states: the "frusto-conical interior surface terminating in a grooved flat adapted to guide the electrolyte." Both the tapered surface of the claimed electrode and the cylindrical surface of the accused electrode terminate in a grooved flat, "adapted to guide the electrolyte." It is unambiguous that the claim - as well as the specification, the prior art, and the prosecution history - refers to the structure of the probe. The patentee was incorrectly subjected to de novo appellate decision on inapplicable findings.
 
 The All Elements Rule
 
 39
 The district court decided the case on an application of the "all elements rule" of Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 4 USPQ2d 1737 (Fed. Cir. 1987) (en banc), cert. denied, 485 U.S. 961 (1988), the court holding that since the "element" of the frusto-conical electrode surface was not present, the all elements rule was violated. Thus the district court held that a finding of infringement under the doctrine of equivalents was precluded.
 
 
 40
 A claim element is a discrete component or element of the device as set forth in the claim. See Pennwalt, 833 F.2d at 939, 4 USPQ2d at 1743 ("position indicating means" is a claim element). Blumenthal points out that the frusto-conical shape is not a missing claim element as contemplated by Pennwalt, but simply the shape that is described for a claim element that is present, viz., the second electrode. Blumenthal states that all of the claim elements are present in the accused probes, and that the only difference is the shape of the second electrode. Blumenthal has correctly stated the law.
 
 
 41
 Whether the cylindrical and frusto-conical shapes are equivalent is a question of fact. This question was not subject to summary resolution against the non-movant, for Blumenthal provided sufficient evidence whereby a reasonable jury could find equivalency between the form of the claimed and the accused electrodes. A change in form is a classical subject of the doctrine of equivalents. See, e.g., Winans v. Denmead, 56 U.S. (15 How.) 330, 342 (1854) ("[It is] a familiar rule that, to copy the principle or mode of operation described, is an infringement, although such copy should be totally unlike the original in form or proportions.").
 
 
 42
 The facts of equivalency require trial. Thus I must dissent from the majority's resolution of this case.
 
 
 
 *
 Newman, Circuit Judge, would rehear the appeal