**Melissa ADDE, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 07–248 C.**

United States Court of Federal Claims.

Oct. 7, 2010.

**6**

R. Scott Oswald, with whom was Nicholas Woodfield, Washington, D.C., for plaintiff.

Russell A. Shultis, United States Department of Justice, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, Martin F. Hockey, Jr., Assistant Director, Washington, D.C., for defendant. Marilyn Blandford, Department of Health and Human Services, Washington, D.C., of counsel.

## OPINION AND ORDER

BUSH, Judge.

This is a civilian pay case brought by an employee of the National Institutes of Health (NIH), which is part of the United States Public Health Service (PHS) of the United States Department of Health and Human Services (DHHS). Plaintiff Melissa Adde has been posted to Brussels, Belgium for a number of years. In an earlier opinion ruling upon defendant's motion to dismiss, this court narrowed the focus of the dispute to Ms. Adde's claim for a "post allowance" for her service from April 23, 2001 to October 3, 2004 in Brussels.[1] *Adde v. United States*, 81 Fed.Cl. 415, 422 (2008) ("Plaintiff has, however, established jurisdiction, and properly stated a claim, for post allowance claims accruing between April 23, 2001 and October 3, 2004."). Defendant later brought a counterclaim against plaintiff, asserting that Ms. Adde has been overpaid by approximately $50,000 during her service in Belgium.

The parties filed cross-motions for summary judgment under Rule 56 of the Rules of the United States Court of Federal Claims (RCFC), and these motions have been fully briefed.[2] For the reasons set forth below, the court finds that defendant's counterclaim is well-founded, but that its overpayment counterclaim must be set off by the post allowance due Ms. Adde. Defendant's summary judgment motion on its counterclaim is granted, plaintiff's cross-motion for summary judgment is denied, and plaintiff's motion for partial summary judgment on her post allowance claim is granted.

## BACKGROUND

For decades, Ms. Adde has worked as a nurse for NIH. Compl. ¶¶ 7–12. Her duty

---

1. A "post allowance" compensates employees whose foreign work station has a higher cost of living than Washington, D.C. This type of allowance will be discussed *infra*.

2. The court ordered defendant to file a sur-reply to respond to untimely arguments set forth for the first time in plaintiff's reply brief. Order of May 27, 2010. The court also notes that plaintiff's response to defendant's proposed findings of uncontroverted fact did not conform to this court's rules and was, as a result, difficult to decipher. *See* RCFC 56(c)(3).

station was changed from Bethesda, Maryland to Brussels, Belgium on approximately April 19, 2000, when she was posted to an international health organization, the International Network for Cancer Treatment and Research (INCTR). *Id.* ¶¶ 11, 13. The disputes in this case focus on whether she has been receiving the correct pay and allowances from NIH over the course of her employment in Belgium from April 19, 2000 through February 2, 2008. It is undisputed that for approximately eight years, Ms. Adde's salary in Brussels, and her step raises, remained consistent with the salary schedule that applied to her position in the United States.

According to defendant, Ms. Adde mistakenly received a salary which was based on a special salary schedule that was applicable to her former duty station, the Washington, D.C. metropolitan area, but that was inapplicable to Brussels. Although plaintiff disagrees with this argument, the facts before the court show beyond dispute that while Ms. Adde worked in Belgium, NIH paid her a salary that was contrary to NIH policy and that was not in accordance with applicable pay statutes. The only explanation that can logically be derived from the parties' allegations of fact is that Ms. Adde's incorrect pay status went unnoticed until it was discovered in 2006.

Turning to the post allowance dispute, Ms. Adde began receiving a post allowance for her service in Brussels in early 2005, which was made retroactive to the beginning of that fiscal year, October 3, 2004. Defendant has conceded that plaintiff's claim to a post allowance for the period of April 23, 2001 to October 3, 2004 has a strong foundation. Unfortunately for plaintiff, this concession yields only a limited victory, because any post allowance awarded to her by this court will be offset by the government's counterclaim for overpayment of her salary.

## DISCUSSION

### I. Jurisdiction

As this court held in its prior opinion, jurisdiction lies for plaintiff's post allowance claim under the Tucker Act, 28 U.S.C. § 1491 (2006); the Back Pay Act, 5 U.S.C. § 5596 (2006); 5 U.S.C. § 5924 (2006) (governing cost of living allowances for overseas duty), and Department of State Standardized Regulations (DOSSR) § 220 (regarding cost of living allowances for overseas duty). *Adde,* 81 Fed.Cl. at 417–19. As for defendant's counterclaim, there is no dispute that the provisions set forth in 28 U.S.C. §§ 1503, 2508 (2006) give this court jurisdiction over the overpayment claim brought against Ms. Adde. *See United States v. Burchard,* 125 U.S. 176, 180, 8 S.Ct. 832, 31 L.Ed. 662 (1888) (approving a government counterclaim for an overpayment to a retired naval officer); *Campbell v. United States,* 137 Ct.Cl. 742, 149 F.Supp. 199, 202 (1957) (stating that "it has long been held that payments made to an officer because of a mistaken construction of the law by a Government department may be recovered by the United States") (citations omitted); *Haustechnik v. United States,* 34 Fed.Cl. 740, 744 (1996) ("Our counterclaim jurisdiction is to be construed broadly.") (citations omitted). Thus, both plaintiff's post allowance claim and defendant's overpayment claim are within this court's jurisdiction.

### II. Standard of Review for RCFC 56 Cross–Motions

 "[S]ummary judgment is a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed.Cir.1987) (internal quotations and citations omitted). The moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." RCFC 56(c)(1). A genuine issue of material fact is one that could change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A summary judgment "motion may, and should, be granted so long as whatever is before the ... court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting former version of Fed.R.Civ.P. 56(c)). However, the nonmoving party has the burden of producing sufficient evidence that there is a genuine issue of material fact in dispute which would allow a reasonable finder of fact to rule in its favor. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Such evidence need not be admissible at trial; nevertheless, mere denials, conclusory statements or evidence that is merely colorable or not significantly probative is not sufficient to preclude summary judgment. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505; *see also Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835–36 (Fed.Cir.1984) (noting that a party's bare assertion that a fact is in dispute is not sufficient to create a genuine issue of material fact). "The party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant." *Barmag*, 731 F.2d at 836.

Cross-motions for summary judgment "are not an admission that no material facts remain at issue." *Massey v. Del Labs., Inc.*, 118 F.3d 1568, 1573 (Fed.Cir.1997) (citing *United States v. Fred A. Arnold, Inc.*, 573 F.2d 605, 606 (9th Cir.1978)). The parties may focus on different legal principles and allege as undisputed a different set of facts. *Id.* "Each party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts." *Id.*

## III. Analysis

### A. Government Counterclaim for Overpayment 1. Relevant Facts

#### 1. Relevant Facts

From 1988 through early 2008, Ms. Adde's salary was based on what the parties refer to as the "Title 38 Special Salary Schedule," the "N01 special salary table," or the "Title 38 # N–01 Special Salary table." The court will refer to this schedule as the N–01 Special Salary Schedule. The N–01 Special Salary Schedule was developed by NIH's Clinical Center to create special pay rates for nurses and other health care professionals. Pl.'s Mot. at 33 n. 4. In 1999, Ms. Adde was promoted to Grade 13 on the N–01 Special Salary Schedule, and started receiving the salary commensurate with that grade. Compl. ¶ 10. When she began working in Brussels in April 2000, her pay status did not change; indeed, an NIH personnel management specialist stated that she was told to "just leave [Ms. Adde] in the pay scale." Pl.'s Ex. 15 at 25:8.

As the years went by, Ms. Adde continued to work in Brussels, received regular step raises, and, in September 2005, was promoted to Grade 13, Step 9 on the N–01 Special Salary Schedule. Compl. ¶ 18. A few months later, Ms. Adde received communications from NIH notifying her that Grade 13 on the N–01 Special Salary Schedule had been eliminated, Pl.'s Ex. 6, and in the fall of 2006, NIH informed Ms. Adde that her pay scale had been wrong since her arrival in Brussels, Pl.'s Ex. 7. Unsurprisingly, Ms. Adde, upon being informed that her correct salary was substantially lower than what she was currently receiving, attempted to negotiate more favorable terms than those proposed to her by NIH. Def.'s Facts ¶¶ 30–31. Specifically, plaintiff declined an offer from NIH to waive the overpayment of salary she had received in Brussels, maintained that she owed NIH nothing, and asked for assurances that her pay would continue to rise from the level she was currently receiving. Def.'s Ex. 19.

Ms. Adde was unable to convince NIH that her view of her pay situation was correct. Neither a grievance filed with the agency, nor an appeal filed with the Merit Systems Protection Board bore fruit. Ms. Adde filed suit in this court on April 23, 2007. Several months later, NIH notified Ms. Adde that effective February 3, 2008, her salary would

no longer be paid at the rates on the N–01 Special Salary Schedule. Def.'s Ex. 21. In December 2008, after several months of alternative dispute resolution (ADR) contacts with an ADR judge of this court, ADR was halted. Because the parties have been unable to reach an amicable solution, the court must decide this dispute as a matter of law.

## 2. Statutory Framework

Certain statutes allow an agency to create a special (and higher) salary schedule for some of its employees, when the federal basic pay scale set forth in the General Schedule (GS), 5 U.S.C. §§ 5104, 5332 (2006), is deemed to be inadequate. One of these statutes is 5 U.S.C. § 5305 (2006), which authorizes the Office of Personnel Management (OPM) to establish higher rates for certain employees in localities where non-federal employers pay such employees significantly higher wages than the GS scale.[3] Id. The special pay rates approved by OPM are designed to improve retention and recruitment of such employees at federal agencies. Id. It is undisputed that special salary schedules at NIH were established pursuant to 5 U.S.C. § 5305, Pl.'s Facts at 16 ¶ 5, and that a delegation agreement between OPM and DHHS permits DHHS to establish certain special pay rates, Pl.'s Answer ¶ 38.

NIH also has authority to set special pay rates for nurses, through reference to the authority of the United States Department of Veterans Affairs (VA) to set special pay rates for nurses. Formerly codified at 38 U.S.C. § 4107 and now codified, as amended in relevant part, at 38 U.S.C. § 7451 (2006), authority is given the VA to establish special pay rates for nurses and other health care professionals. Laws passed in 1986 and 1988 allowed NIH to establish special pay rates in accordance with the VA's special pay rate-setting authority now set forth in Section 7451. Pub.L. No. 99–349, ch. VIII, 100 Stat. 710, 738 (1986) ("Funds made available for fiscal year 1986 and hereafter to the Warren G. Magnuson Clinical Center of the National Institutes of Health shall be available for payment of nurses at the rates of pay and with schedule options and benefits authorized for the Veterans Administration pursuant to

38 U.S.C. [§ ] 4107."); 42 U.S.C. § 284c(b) (2006) ("For fiscal year 1989 and subsequent fiscal years, amounts made available to the National Institutes of Health shall be available for payment of nurses and allied health professionals in accordance with payment authorities, scheduling options, benefits, and other authorities provided under chapter 7[4] of Title 38 for nurses of the Department of Veterans Affairs."). This statutory grant of authority to NIH gave rise to the specific "Title 38" special pay schedule at NIH referred to in this opinion as the N–01 Special Salary Schedule.

The parties strongly disagree as to the guidance these statutes provide to NIH as to the use of its N–01 Special Salary Schedule. According to defendant, "[t]he expressed purpose of the cited Veteran Administration statute was to ensure that the rates of basic pay for its health-care personnel were sufficient for the [NIH Clinical Center] to be competitive, on the basis of pay and other employee benefits, with non-Department health-care facilities 'in the same labor-market area,' in the recruitment and retention of qualified personnel." Def.'s Mot. at 6 (quoting 38 U.S.C. § 7451(a)(1) and adding emphasis). Thus, defendant concludes that the N–01 Special Salary Schedule was initially limited to the Washington, D.C. metropolitan area, and going forward, that the N–01 Special Salary Schedule and other NIH special salary schedules would always be limited to specific labor markets in specific localities where a market analysis of pay rates and recruitment and retention issues permitted NIH to pay its employees more than GS pay. Def.'s Reply at 11 ("NIH was authorized to follow the same process that allowed the Veterans[ ] Administration's directors of health-care facilities to pay health-care personnel at a rate of pay that was sufficient for that facility to be competitive, on the basis of pay and other employee benefits, with non-government health-care facilities in the same labor market.").

Plaintiff, on the other hand, asks the court to ignore the content and purpose of the statutes authorizing NIH to create special

---

3. Section 5305 also provides other rationales for special pay schedules.

pay schedules, and asserts that "none of the Public Laws cited by the Public Health Service ("PHS") Title 38 Instruction and [the NIH] Clinical Center's Title 38 Handbook ... prohibit Title 38 Special Pay Rates from overseas application." Pl.'s Reply at 6. While this statement may be true, it is irrelevant to the issue before the court. The specific question before the court is whether an overseas NIH employee could be paid through one specific NIH special salary schedule, the N–01 Special Salary Schedule.

■ The statutes which authorize the use of the N–01 Special Salary Schedule by NIH do not authorize NIH to use that special salary schedule in localities where a market analysis has not been performed to justify its use. Furthermore, it appears to the court that special salary schedules created under these authorities would generally be tied to one or more localities where the appropriate market analyses were performed. *See* 5 U.S.C. § 5305(a)(1) ("Whenever the Office of Personnel Management finds that the Government's recruitment or retention efforts with respect to 1 or more occupations in 1 or more areas or locations are, or are likely to become, significantly handicapped ..., the Office may establish *for the areas or locations involved,* ... higher minimum rates of pay for 1 or more grades or levels, occupational groups, series, classes, or subdivisions thereof, and may make corresponding increases in all rates of the pay range for each such grade or level."). The N–01 Special Salary Schedule, in particular, was developed for the Clinical Center at NIH and its initial justification was necessarily tied to the labor market for nurses and other health-care professionals in the Washington, D.C. metropolitan area. There is no indication in any of the laws extending special pay authority to other NIH entities that the link between the N–01 Special Salary Schedule and the Washington, D.C. labor market was ever broken. Indeed, when NIH addressed the need for a special salary schedule for its Phoenix, Arizona employees, NIH created a new special salary schedule for that locality, and did not pay those Phoenix employees at N–01 Special

Salary Schedule rates. Def.'s Ex. 6 at 61:8–16. Thus, as the court understands the development and authorization of the N–01 Special Salary Schedule, that special salary schedule cannot be used outside of the Washington, D.C. labor market.

Plaintiff's other attempts to invalidate the statutory limitations on the use of the N–01 Special Salary Schedule are similarly unavailing. Plaintiff suggests that there is some significance in the fact that Ms. Adde, at all pertinent times, was working not for the Clinical Center, but for the National Cancer Institute (NCI), a distinct entity within NIH that is not part of the Clinical Center. Pl.'s Mot. at 18; Pl.'s Reply at 4. This is a distinction without a difference. It is clear from the record before the court that the N–01 Special Salary Schedule was used to pay NIH nurses in the Washington, D.C. area, whether they worked at NCI or the Clinical Center. There is no support for plaintiff's inference that the linking of the N–01 Special Salary Schedule to the Washington, D.C. labor market was, according to the authorizing statutes, any less imperative for NCI nurses than for Clinical Center nurses.

Finally, in her reply brief, plaintiff suggests that the special pay authority that would have permitted her to be paid in Brussels according to the N–01 Special Salary Schedule can be found in 38 U.S.C. § 7455(b)(2)–(3) (2006).[4] Pl.'s Reply at 9 n. 2 (noting that "specialized skills and personnel staffing [needs] at particular facilities" may in some instances justify a special salary schedule), 13 n. 5 (same). There are two problems with plaintiff's suggestion. First, the argument is based totally on conjecture and has no support in any of the parties' allegations of fact. It is telling that plaintiff's reply brief footnotes fail to cite to the extensive factual record developed during the discovery phase of this litigation.

Second, every factual allegation before the court links the N–01 Special Salary Schedule, the pay schedule that produced the overpayment received by Ms. Adde, to the Washington, D.C. labor market, not to the labor market in Brussels, Belgium. It is impossi-

4. Section 7455, like section 7451, is a re-codification of a portion of former 38 U.S.C. § 4107 which authorizes special salary rates for VA health-care professionals.

ble to infer from this record that (1) NIH conducted a recruitment and retention analysis of its staffing needs in Brussels before posting Ms. Adde there, but nowhere documented such an analysis; (2) NIH relied on 38 U.S.C. § 7455(b)(2)–(3) to justify and create a special salary schedule for Ms. Adde in Brussels, but nowhere documented its decision; and, (3) no overpayment occurred because Ms. Adde was receiving the correct salary according to an undocumented NIH Brussels special salary schedule, which, by coincidence, matches rates of pay on the N–01 Special Salary Schedule. *See* Def.'s Ex. 5 at 39 (stating that there was no record of the creation at NIH of a special salary schedule for Brussels). Such fanciful speculation on the part of plaintiff is not sufficient to overcome a properly-supported summary judgment motion.

The court concludes that the N–01 Special Salary Schedule is not applicable to Brussels, Belgium, because the authorizing statutes do not permit NIH to use that particular special salary schedule outside of the labor market for which it was developed.

### 3. NIH Policy

#### a. Clear and Long–Standing Policy

Even if the court has erred in its interpretation of the statutes authorizing NIH to develop special pay schedules for its employees, including the N–01 Special Salary Schedule, NIH has interpreted these statutes reasonably and its long-standing policy regarding the N–01 Special Salary Schedule is entitled to this court's deference. NIH's long-standing policy has been to restrict the use of the N–01 Special Salary Schedule to the Washington, D.C. labor market. This policy is set forth in both documentary evidence and deposition testimony in the record before the court.

For example, various policy statements promulgated by NIH link the N–01 Special Salary Schedule to the Washington, D.C. metropolitan area labor market. Def.'s Exs. 7 at 1, 8 at 1; *see also id.* Ex. 10 at ADDE00164 (stating that a special salary rate is "established on a nationwide, local or other geographic basis depending on the nature and extent of the recruitment or reten-

tion difficulties and the geographic boundaries of the relevant labor market"). NIH policy statements also note that locality pay, which for GS positions varies from city to city, is not provided to employees on the N–01 Special Salary Schedule or other special salary schedules. Def.'s Exs. 7 at 2, 8 at 1. It is clear from the record that NIH nurses, whether they worked for NCI or the Clinical Center, did not receive locality pay if they were on the N–01 Special Salary Schedule. *See* Pl.'s Ex. 23 (showing that Ms. Adde, an NCI employee, was not receiving locality pay while working in the Washington, D.C. area), Def.'s Ex. 9 at 2 (same).

There is further evidence that the N–01 Special Salary Schedule has always been considered to be specific to the Washington, D.C. area. In May 2005, it is undisputed that NIH, pursuant to a directive from OPM, eliminated Grades 13–15 on the N–01 Special Salary Schedule because the locality pay in Washington, D.C. for GS positions at those grades surpassed the pay available to Grades 13–15 employees on the N–01 Special Salary Schedule. Def.'s Exs. 14, 17 at 4; Def.'s Facts ¶ 23. All of this documentary evidence shows that the N–01 Special Salary Schedule is locality specific, and specific to the Washington, D.C. area, and that NIH policy does not permit the N–01 Special Salary Schedule to govern pay for NIH employees working overseas.

This documentary evidence is buttressed by all of the deposition testimony cited by the parties. Every deponent with knowledge of NIH policy reported that the N–01 Special Salary Schedule was created for and remained applicable to the Washington, D.C. area labor market. *See generally* Def.'s Exs. 5–6. In addition, the testimony in the record rebuts plaintiff's contention that any NIH policy statements regarding the N–01 Special Salary Schedule were directed to Clinical Center employees and had no relevance to NCI employees such as Ms. Adde. Def.'s Exs. 5 at 19, 6 at 63–64. The record shows that NIH policy limited the application of the N–01 Special Salary Schedule to its employees working in the Washington, D.C. metropolitan area. It is of no consequence that NIH, when it posted Ms. Adde to Belgium,

neglected to correctly apply this policy to an unusual personnel situation. NIH policy clearly does not support setting Ms. Adde's salary in Brussels at the rates set forth in the N–01 Special Salary Schedule. Def.'s Ex. 5 at 37 (noting that a "separate pay scale would have had to have been developed for her").

### b. Deference

As to the deference to be given NIH policy regarding the uses of its N–01 Special Salary Schedule, the parties debate whether *Chevron* or *Skidmore* deference is appropriate in this case. *See* Def.'s Mot. at 3 (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); Pl.'s Reply at 10 (suggesting that *Chevron* deference is not warranted for "NIH's unpublished interpretation" of statutes governing Title 38 special salary schedules); Def.'s Sur–Reply at 4 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), and suggesting that NIH policy survives review even under the less deferential *Skidmore* standard). The court need not decide whether *Chevron* or *Skidmore* deference is due NIH policy regarding the use of the N–01 Special Salary Schedule, because even under *Skidmore*, NIH policy is due deference because it is a reasonable and permissible interpretation of the statutes authorizing pay under this schedule.

■■■ Under *Skidmore*, this court must "defer to an agency interpretation of the statute that it administers if the agency has conducted a careful analysis of the statutory issue, if the agency's position has been consistent and reflects agency-wide policy, and if the agency's position constitutes a reasonable conclusion as to the proper construction of the statute, even if we might not have adopted that construction without the benefit of the agency's analysis." *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1366 (Fed.Cir.2005). Here, the court cannot fault NIH's analysis of its statutory authority to create special pay schedules or its reasonable policy based on that analysis, because the court's own analysis has produced the same conclusion. The court notes, too, that NIH policy in this regard is consistent over time and agency-wide. Thus, NIH policy restricting the use of the N–01 Special Salary Schedule to Washington, D.C. metropolitan area salaries survives review under the *Skidmore* standard. Even if the statutes authorizing the use of the N–01 Special Salary Schedule are less restrictive than NIH and this court believe, NIH policy is entitled to deference from this court and Ms. Adde may not be paid according to the N–01 Special Salary Schedule in Belgium.

### 4. Plaintiff's Liability

Because plaintiff was overpaid during her service in Belgium due to an incorrect application of the N–01 Special Salary Schedule, the only remaining issue related to defendant's counterclaim is whether plaintiff is liable to the government for $50,430.20, as shown by an audit conducted by the Defense Finance and Accounting Service. Def.'s Ex. 22 at 1. Plaintiff has failed to establish a genuine issue of material fact as to the quantum of the overpayment received by Ms. Adde. The only argument raised by plaintiff regarding defendant's counterclaim that even tangentially addresses quantum is based on its reading of *Holland v. United States*, 86 Fed.Cl. 681 (2009). Pl.'s Reply at 16–17 (relying on *Holland* to state that "the burden of proof for a counterclaim falls upon the moving party asserting a particular set of facts as to the existence of those facts"). *Holland* relies on Illinois law to resolve an entirely distinguishable controversy and has no bearing on the case at hand. 86 Fed.Cl. at 698 (noting that it was the defendant's burden in that case to establish how much, if any, of a previous settlement payment disposing of a previous lawsuit could be set off against the government's liabilities in the later suit).

■■■ Even if plaintiff had found more pertinent authority for the proposition that a defendant bears the burden of establishing the quantum of its counterclaim, such a burden has been met here. The government has set forth a detailed and comprehensive analysis of the overpayment received by Ms. Adde, an analysis establishing a quantum of damages which remains unchallenged by plaintiff. Because no genuine issue of material fact

exists on this record, and because defendant has shown that it is entitled to $50,530.20 on its counterclaim as a matter of law, the court grants defendant's motion for summary judgment upon its counterclaim.

## B. Plaintiff's Post Allowance Claim

 As this court noted in its earlier opinion, 5 U.S.C. § 5924 (2006) governs cost of living allowances paid federal employees working overseas, and includes a post allowance to compensate for foreign area living costs that exceed those experienced in Washington, D.C. *See also* DOSSR § 211 ("The term 'cost of living allowance' means an allowance granted under the authority of title 5 U.S.C. [§ ] 5924. Cost of living allowances include the post allowance ( [DOSSR] Section 220)...."). Although Ms. Adde was posted to Belgium in April 2000, and made inquiries and requests for a post allowance, she did not begin receiving a post allowance until early 2005, retroactive to October 3, 2004. *See* Pl.'s Facts at 14 ¶¶ 58–59; Def.'s Answer ¶ 16. This court held in its earlier opinion that plaintiff's claim for a post allowance for the period of April 23, 2001 to October 3, 2004 survived defendant's motion to dismiss. *Adde*, 81 Fed.Cl. at 422.

Plaintiff has moved for partial summary judgment on her post allowance claim. Plaintiff cites, in particular, to correspondence that indicates that only minimal procedural steps would be needed for NIH to process her requests for a post allowance for the period in question. Pl.'s Ex. 37 at 583–84. Defendant has acknowledged the strength of her claim, but notes that quantum has yet to be determined, and that any amount due Ms. Adde on her post allowance claim must be set off against the government's counterclaim for salary overpayment. The court finds that there is no genuine issue of material fact regarding the government's liability for a post allowance to be paid Ms. Adde for the period of April 23, 2001 to October 3, 2004. The court encourages the parties to speedily and cooperatively determine the quantum of damages due Ms. Adde on her post allowance claim. Further litigation of this dispute, in the court's opinion, would be a terrible waste of the parties' resources.

## CONCLUSION

There is no genuine issue of material fact as to the merits of the government's salary overpayment counterclaim, which is in the amount of $50,430.20. However, the amount due plaintiff on her claim for a post allowance has not yet been established. This amount, set off against $50,430.20, will determine the judgment that will be entered in this case. The parties are urged to stipulate to an amount that reflects the court's holding in this opinion, or to otherwise settle this dispute.[5]

Accordingly, it is hereby **ORDERED** that

(1) Defendant's Motion for Summary Judgment upon Counterclaim, filed November 6, 2009, is **GRANTED;**

(2) Plaintiff's Cross–Motion for Summary Judgment on Defendant's Counterclaim, and Plaintiff's Motion for Partial Summary Judgment on Her Claim, filed December 7, 2009, is **DENIED in part,** as to defendant's counterclaim, and **GRANTED in part,** as to the government's liability on plaintiff's post allowance claim; and,

(3) On or before **December 30, 2010,** the parties shall **CONFER** and **FILE** a stipulation as to the amount of this court's judgment, reflecting the overpayment of $50,430.20 due defendant and the post allowance due plaintiff, consistent with the holding in this opinion. If agreement cannot be reached as to the judgment to be entered in this case, and if the parties cannot otherwise settle this dispute, the parties shall, on or before **December 30, 2010, FILE** a proposed schedule for the filing of dispositive motions on the

---

5. A quick resolution of the issue of the quantum of damages for plaintiff's post allowance claim would offer a measure of finality to the parties, or, at the very least, more rapid access to appellate review. If the parties bring this final dispute before the court, the parties are reminded that their arguments should be buttressed with relevant legal authority, and that they should not re-argue liability issues that have been resolved in this opinion.